Ludwig Baumann & Company, successor by merger to Elbeco Realty Corporation v. Commissioner.
Ludwig Baumann & Co. v. Commissioner
Docket No. 72250.
United States Tax Court
T.C. Memo 1961-271; 1961 Tax Ct. Memo LEXIS 72; 20 T.C.M. (CCH) 1415; T.C.M. (RIA) 61271; September 29, 1961
*72 Two corporations, Elbeco and Eastern, were wholly-owned subsidiaries of another corporation, Baumann. Elbeco made advances in excess of $1,000,000 to Eastern over a period of approximately three years. Unsecured non-interest bearing demand notes were given, but no repayment or demand for repayment was ever made. The larger advances were made at a time when Eastern was reporting net operating losses and its financial condition indicated that there was not a reasonable hope or expectation that the advances would be repaid. Held, that the advances did not constitute bona fide debts and that Elbeco is not entitled to a claimed partial bad debt deduction for the year 1953 under section 23(k)(1) of the Internal Revenue Code of 1939. Karl W. Windhorst, Esq., 125 Park Ave., New York, N.Y., for Petitioner. Joseph F. Rogers, Esq., for Respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax of the petitioner for the taxable years 1952 and 1953, as successor by merger to Elbeco Realty Corporation, in the amounts of $6,841.92 and $102,674.34, respectively. The issue presented is whether Elbeco was *73 entitled to a deduction of $390,000 claimed by it as a partial bad debt in its 1953 income tax return. Dependent upon the decision of this issue is the issue of whether Elbeco sustained a net operating loss in 1953 which may be carried back to the year 1952. Findings of Fact Some of the facts have been stipulated and the stipulations are incorporated herein by this reference. The petitioner, Ludwig Baumann & Company, sometimes hereinafter referred to as Baumann, is a corporation organized and existing under the laws of the State of New York, having its principal office in the city of New York. At all times pertinent hereto it was engaged in the retail furniture and house furnishings business, operating mainly on the installment or credit basis. In 1952 up to December 1, its officers were: W. S. Baumann, president; M. I. Behrens, vice president; G. D. Wechsler, treasurer and assistant secretary; and C. L. Froelich, secretary and assistant treasurer. Its board of directors consisted of the same persons, Froelich being chairman. Elbeco Realty Corporation, hereinafter referred to as Elbeco, was organized in 1921 under the laws of the State of New York, having its principal place *74 of business in New York City. It was engaged in the business of owning and leasing real estate. It filed its Federal income tax returns with the district director of internal revenue, Brooklyn, New York. During the period of time in question, until December 31, 1953, Elbeco was a wholly owned subsidiary of Baumann. At the close of 1953 it was merged into Baumann, and it is solely by reason of this merger that Baumann is the petitioner herein. During the years in question the officers and directors of Elbeco were the same as those of Baumann. The principal office of both corporations was at the same address. In 1946 Baumann acquired all of the issued and outstanding stock of an existing corporation, Eastern Supply Company of New Jersey, Inc., a New Jersey corporation, hereinafter referred to as Eastern. Thereafter Baumann organized additional Eastern Supply companies as follows: 1949 Eastern Supply Company, Charlotte, Inc. (Delaware) 1949 Eastern Supply Company, Greensboro, Inc. (Delaware) 1949 Eastern Supply Company, Greenville, Inc. (Delaware) 1949 Eastern Supply Company, Georgia, Inc. (Delaware) 1949 Eastern Supply Company, Columbus, Inc. (Delaware) 1950 Eastern Supply *75 Company, Newburgh Corporation (New York) At all times pertinent herto, Baumann owned all of the issued and outstanding stock of the above-mentioned companies, and the officers and directors of such companies were the same as those of Baumann. The various Eastern Supply companies were engaged in the business of direct house to house canvassing and selling of housewares and house furnishings, on the installment basis or credit plan. Spear and Company, hereinafter referred to as Spear, is a corporation organized in 1903 under the laws of New Jersey. On December 1, 1952, Spear acquired a controlling interest in Baumann. At the time of acquisition, Spear was controlled by a group which owned 52 percent of its stock. Abraham Kaminsky owned 25 percent of the stock held by this group, and was at that time a director of Spear. After Spear acquired its controlling interest in Baumann, Kaminsky also became a director of Baumann, Elbeco and the Eastern Supply companies, and A. M. Kahn, chairman of the board of directors of Spear, became chairman of the board of directors of each of such companies. Behrens, who had been executive vice president of Baumann became president of Spear, Baumann, *76 and the other corporations as well as a director of each. Weschler who had been treasurer and assistant secretary of Baumann became treasurer and assistant secretary of each of the companies. R. A. Steele, who had been with Spear, became secretary of each of the companies. Kahn as chairman of the board and Behrens as president exercised practical control over the operations of all of the companies. Prior to the acquisition of control of Baumann by Spear, Kaminsky had had no association with Baumann. On November 28, 1953, Kaminsky acquired the controlling stock interest in Spear. On November 30, 1953, Kahn resigned as chairman of the board of directors of each of the corporations and Kaminsky became chairman of the board of directors of each. On November 30 Behrens submitted his resignation as president of each corporation, effective February 1, 1954, and Kaminsky replaced him as president. M. R. Gallop replaced Kahn as a director. Although Behrens officially remained president until February 1, 1954, in fact he did not actively participate in management after December 1, 1953. On December 29, 1953, Kaminsky became treasurer of each of the corporations, replacing Wechsler, and Gallop *77 became secretary, replacing Steele. Commencing December 2, 1953, Kaminsky was in active charge of the entire operations of Spear, Baumann, Elbeco, and all of the Eastern Supply companies, devoting his entire time thereto. No salaries to officers were paid by Elbeco or any of the Eastern Supply companies in 1952 and 1953. Salaries were paid by Baumann in those years to its officers. Elbeco made unsecured cash advances to Eastern on dates and in amounts as follows: Date
Amount of Advance
February 27, 1950
$ 50,000.00
March 10, 1950
35,000.00
September 18, 1950
20,000.00
December 11, 1950
20,000.00
September 10, 1951
25,000.00
April 7, 1952
25,000.00
October 27, 1952
5,000.00
October 27, 1952
20,000.00
December 3, 1952
340,000.00
March 16, 1953
15,000.00
April 27, 1953
467,772.54
Total
$1,022,772.54
In each instance Eastern issued a noninterest bearing demand note in the amount of the advance, payable to the order of Elbeco. None of the minute books of Spear, Baumann, Elbeco, or Eastern contained any mention of these advances. The above advances were reflected on the books of Elbeco as amounts owing to it from Eastern. They were included *78 in its ledger account headed "Eastern Supply Co. of N.J. Inc. - advances". Its balance sheets as of the end of each of the years 1951 and 1952 reflected these advances as "Accounts receivable". Its balance sheet as of December 31, 1953, included them under "Other Assets", as distinguished from "Current Assets", under the heading "Advances to affiliated company". Such advances were reflected on the books of Eastern as amounts owed to Elbeco. Such amounts were included in its balance sheets as of the end of 1951 and 1952 under the heading "Due to Elbeco Realty Corporation", but not among its listed current liabilities. In its balance sheet as of December 31, 1953, they are included among "Current Liabilities" under the heading "Due to affiliates". Kaminsky did not play an active part in arranging the advances made by Elbeco to Baumann in 1952 and 1953. On October 31, 1952, Elbeco owed Greenwich Savings Bank the amount of $640,000, representing the then unpaid balance of a loan secured by a mortgage on some property of Elbeco located in Brooklyn, New York. On November 28, 1952, Elbeco refinanced and satisfied the mortgage by arranging a new loan and mortgage of $1,000,000 with *79 Seamen's Bank for Savings. Of this loan $640,000 plus accrued interest and other charges totaling $10,666.67 was paid to the Greenwich Savings Bank, and Elbeco received in cash the remainder of $349,333.33. [1] The $1,000,000 mortgage bore interest at the rate of 4 1/4 percent per annum, was due in 1962, and was payable in monthly installments of $6,000. On April 24, 1953, Elbeco sold a building located at 210 Livingstone Street, Brooklyn, for an amount of $1,655.824.50 after expenses of sale. [2]
*80 Eastern in turn made advances to the other Eastern Supply companies. The amounts shown by the consolidating balance sheet as owing to Eastern from the other Eastern Supply companies at the end of 1952 and 1953 are as follows: End of
End of
Due Eastern from
1952
1953
Eastern Supply Co., New-
burgh
$ 60,024
Eastern Supply Co., Char-
lotte
153,153
$198,907
Eastern Supply Co., Greens-
boro
116,539
127,473
Eastern Supply Co., Green-
ville
446,340
529,831
Eastern Supply Co., Georgia
69,054
101,188
Eastern Supply Co., Colum-
bus
34,529
40,304
$879,639
$997,703
Eastern and the other Eastern Supply companies owed amounts to Baumann for funds received by them from loans obtained pursuant to a revolving account receivable loan agreement entered into by them and Spear on December 1, 1952, with four New York banks. Pursuant to these agreements, loans were made to Spear against the assignment of all accounts receivable of Spear, Baumann, and all the Eastern Supply companies. The amount agreed to be loaned by the banks was not to exceed 80 percent of the aggregate unpaid amount of assigned receivables, exclusive of defaulted accounts receivable. *81 The receivables of the Eastern Supply companies were assigned to Baumann which assigned them to Spear, which in turn assigned them to the banks. As loans were thus obtained by Spear it retained the portions secured by its accounts receivable and it then issued its checks to Baumann for the amount of the loans based upon all the other accounts receivable. Baumann issued checks to the various Eastern Supply companies in amounts based upon the accounts receivable which each had assigned. The consolidating balance sheet of Spear and Company and its subsidiary companies shows a liability of Spear to the bank of the full amount borrowed, a liability of Baumann to Spear for the amount paid to it, and liabilities of each Eastern Supply company to Baumann in the amounts of the funds which Baumann had passed on to each of its subsidiaries, the Eastern Supply companies. According to such consolidating balance sheet, at December 31, 1952 and 1953, Eastern owed Baumann amounts of $222,083 and $181,626, respectively, for which accounts receivable had been pledged in the respective amounts of $356,557 and $308,236. According to such balance sheet, the aggregate of amounts owed Baumann by the other *82 Eastern Supply companies at those dates were $527,944 and $173,836, respectively, for which aggregate accounts receivable had been pledged in the respective amounts of $1,086,317 and $348,105.00. At all material times the capitalization of Eastern consisted of $40,000 of common stock, all of which was owned by Baumann. The outstanding indebtedness of Eastern (plus reserve for income taxes in certain years) and the excess of its assets over such indebtedness as of the end of each of the calendar years 1949, 1950, 1951, 1952, and 1953, as shown in balance sheets attached to its income tax returns, were (in round figures) as follows: Outstanding
Excess of as-
End of
indebted-
sets over in-
year
ness [1]
debtedness
1949
$ 863,000
$260,000
1950
1,086,000
269,000
1951
830,000
240,000
1952
1,050,000
216,000
1953
1,250,000
(701,000) [2]
The income tax returns of Eastern for the years 1950 through 1957 showed *83 the following amounts of net income or net loss: 1950
$127,471.58
(before deduction
of $104,794.60 net
loss carryover).
1951
( 2,812.67)
1952
( 63,916.96)
1953
(124,094.52)
1954
(136,476.62)
1955
( 35,009.7)
1956
(892,933.54) [1]
1957 (yr. of li-
quidation)
(153,793.29) [2]
The outstanding aggregate indebtedness of the other Eastern Supply companies and the excess of their assets over such indebtedness (or vice versa) as of the end of the calendar years 1949-1953, as shown in balance sheets attached to their income tax returns were (in round figures) as follows: Outstanding
Excess of As-
End of
Indebted-
sets over In-
Year
ness
debtedness
1949
$ 440,000
$ 41,000 [1]
1950
808,000
78,000 [1]
1951
990,000
23,000 [1]
1952
1,450,000
(572,000) [2]
1953
1,260,000
(862,000) [2]
*84 The aggregate of net income or net loss of the other Eastern Supply companies as shown in their returns for the years 1950 through 1957 were as follows: 1950
$ 54,710 [1]
1951
( 51,025) [1]
1952
(196,191) [1]
1953
(619,696) [2]
1954
(112,245) [3]
1955
( 60,414)
1956
(170,723) [4]
1957
( 14,607) [5]
In the early part of December 1953, after becoming chairman of the board of directors of Spear and its subsidiaries, Kaminsky made a study of the enterprises of such subsidiaries. In connection therewith an auditing firm made a study of the financial condition of Eastern and the other Eastern Supply companies. During the month of December discussions were had by Kaminsky with other officers of the companies and representatives *85 of the accounting firm. At a meeting held in the latter part of December 1953 among Kaminsky, Wechsler, Behrens, and Brown, comptroller of Spear, and representatives of the accounting firm, it was determined that in view of the fact that the Eastern Supply companies were suffering losses in their operations; that their accounts receivable, their principal assets, were not "as healthy an asset as they should have been or might have been"; and that their businesses could not be improved, an orderly liquidation of such companies should be accomplished. At this time Kaminsky also examined the financial condition of Elbeco. Discussions were had with the above-mentioned officers, and representatives of the accounting firm, as to what action should be taken with respect to the large amount of indebtedness shown on its books as owing from Eastern. It was concluded that the value of Eastern's assets was less than such indebtedness and that therefore a portion should be written off on the books of Elbeco. Thereafter the accounting firm prepared a journal entry and submitted it to the bookkeeping department of Elbeco on January 23, 1954. Pursuant thereto an entry was made on the journal of *86 Elbeco as of December 31, 1953, in the amount of $390,000 "To write off partial bad debt of Advance to Eastern Supply, N.J." This journal entry was reflected in Elbeco's ledger in the account "Eastern Supply Co. of N.J., Inc. - advances". An entry was also made in the journal as of December 31, 1953, in an amount of $310,000.00, setting up a "Reserve for Loss E.S.N.J." on account of the advances to Eastern. The sum of $390,000 and $310,000, or $700,000, represented the excess of the liabilities of Eastern over its assets, as shown in its balance sheet. On April 7, 1954, Kaminsky, as president and chairman of the board of Spear, issued the annual statement to stockholders for 1953 in which he stated that the operations of Spear and its subsidiaries resulted in a substantial loss in 1953; that approximately 80 percent of the consolidated net loss of Spear and its subsidiaries was attributable to the operating loss of Eastern [apparently referring to all the Eastern Supply companies]; that during the year the business of Eastern was reorganized, management and personnel changed, some branches closed, and large amounts of uncollectible accounts receivable charged off; that although *87 Eastern was still not operating at a profit, the operating losses for the first three months of 1954 were a fraction of the losses of the corresponding three months of 1953; and that it was expected, barring some unforeseen circumstances, that Eastern should operate at a small profit in 1954. On February 16, 1953, Elbeco made a loan of $77,500, with interest at 5 percent, to a corporation known as 2212 Third Avenue Corporation, which was a subsidiary of Spear, but not a subsidiary of Baumann. This loan was duly recorded on Elbeco's books and as of the end of 1953 Elbeco accrued interest thereon in the amount of $3,390.60 which it included in income in its income tax return for 1953. None of the advances made by Elbeco to Eastern were ever repaid, and no demand for repayment was ever made by Elbeco. Eastern had accounts payable to numerous creditors other than its related corporations, the amount so owed at the end of 1953 being $19,113.67. None of its creditors ever sustained any loss on any of these accounts, their bills being paid periodically as they became due. The returns of Elbeco for the years 1950 through 1953 report no dividends paid to stockholders. Spear, Baumann, *88 Elbeco, Eastern, and the other Eastern Supply companies filed separate returns for the years 1952 and 1953. In its return for the year 1952, Elbeco reported net income of $22,806.40 and a tax liability of $6,841.92, which was paid. In its return for the year 1953, it reported a net loss of $24,079.51 resulting from the deduction, as a partially bad debt, of an amount of $390,000 of the advances made to Eastern. In determining the amount of partial worthlessness to be charged off and deducted, Kaminsky and the other officers and the representatives of the accounting firm fixed upon the amount of $390,000, rather than a greater amount, since the deduction in the amount of $390,000 was sufficient to offset the income of that year and result in a net loss sufficient, when carried back to the year 1952, to offset the income of that year. On May 13, 1954, Elbeco filed an application for a tentative carry-back of the net operating loss of 1953 to the year 1952. On June 18, 1954, the respondent gave notice of the allowance of the tentative carry-back adjustment claimed, and the tax of $6,841.92 paid for 1952 was refunded. In the notice of deficiency, the respondent disallowed the partial *89 bad debt deduction claimed for 1953, resulting in a corrected net income of $364,420.49. Therein he stated in explanation: It is determined that the amount of $390,000.00 is not deductible as a partial bad debt for the year 1953 under the provisions of Section 23(k)(1) of the Internal Revenue Code of 1939. In determining the deficiency for the year 1952 in the amount of $6,841.92, the respondent stated that inasmuch as Elbeco derived net income for 1953, no amount was deductible as a net operating loss carry back to the year 1952. The advances made by Elbeco to Eastern did not result in the creation of bona fide indebtedness owing from Eastern to Elbeco. Opinion It is elementary that among the prerequisites for a bad debt deduction under the statute [3] are a clear showing that the parties intended to create a debtor-creditor status and that a debt in fact exists. Evans Clark, 18 T.C. 780, aff'd per curiam (C.A. 2), 205 F. 2d 353, and cases cited therein; Republic Steel Corporation v. United States (Ct. Cls.), 159 F. Supp. 366. *90 Considering the record as a whole, it is our conclusion that the advances made by Elbeco to Eastern did not create a bona fide debtor-creditor relationship and that Elbeco is not entitled to the bad debt deduction claimed. It is true that notes were given, but the giving of a note is not in itself conclusive of the existence of a bona fide debt. Republic Steel Corporation v. United States, supra; Hattie Wolff, 26 B.T.A. 622; George W. Griffiths, 25 B.T.A. 1292; and C. B. Hayes, 17 B.T.A. 86. It is also true that Elbeco and Eastern carried the advances on their books as amounts owing to Elbeco. However, although the manner of treatment of a transaction on the books of a corporation is some evidence of the nature of the transaction, it is not determinative. Doyle v. Mitchell Bros. Co., 247 U.S. 179, certiorari denied 323 U.S. 783, affirming a Memorandum Opinion of this Court; Commissioner v. North Jersey Title Ins. Co. (C.A. 3), 79 F. 2d 492, affirming a Memorandum Opinion of this Court; and Eli Goodstein, 30 T.C. 1178, affd. (C.A. 1), 267 F. 2d 127. It is the substance, *91 rather than the form of the transaction which is governing. Gilbert v. Commissioner (C.A. 2), 262 F. 2d 512; and Republic Steel Corporation v. United States, supra. The advances in question totaled $1,022,772.54 and were made over the period from February 27, 1950 to April 27, 1953, the principal ones being $340,000 on December 3, 1952 and $467,772.54 on April 27, 1953. There was no definite date agreed upon for repayment. Demand notes were given, but no demand was ever made and no amount was ever repaid, whereas other creditors of Eastern were paid. No interest was provided for and none was paid. The $340,000 advance made on December 3, 1952, was made from money borrowed by Elbeco from the refinancing of one of its properties. It paid the bank interest of 4 1/4 percent, yet made no charge for interest to Eastern. (We note that by contrast Elbeco made a loan of $77,500 in 1953 to another corporation, a subsidiary of Spear, but not a subsidiary of Baumann, and that interest of 5 percent was charged on such loan.) No security was furnished by Eastern. Commencing on December 1, 1952, which was before the largest advances were made, Eastern's accounts receivable *92 were pledged to secure loans made by the New York banks under the revolving loan arrangement. The advances received by Eastern from Elbeco were in turn advanced by Eastern, in whole or in large part, to the other Eastern Supply companies. The accounts receivable of such other Eastern Supply companies were also pledged under the revolving loan arrangement and hence Eastern had no security to support its advances to the other companies. From 1951 to 1957 the income tax returns of Eastern showed net losses and the same was true of the other Eastern Supply companies. The balance sheets accompanying Eastern's returns for 1951, 1952, and 1953 also indicate that at the time the larger advances were made to it by Elbeco the excess of its assets over its outstanding indebtedness was greatly less than the advances made. The returns of the other Eastern Supply companies show that at the times they received advances from Eastern in large amounts their net worth was not such as to indicate a reasonable expectation that the advances would be repaid to Eastern. Under all these circumstances we think it must be concluded that there was no reasonable expectation that the advances made by Elbeco to *93 Eastern would be repaid and that there was no bona fide intent to create a debtor-creditor relationship between Elbeco and Eastern. On brief the petitioner contends that when, on December 1, 1952, Spear gained control of Baumann and its subsidiaries and new management was installed, it was reasonable to expect that improvements made by the new management would result in more profitable operations and that hence there was a reasonable expectation of repayment of the advances. However, none of the officers of the various companies who were active when the larger advances were made in 1952 and 1953 were called as witnesses. Kaminsky, who was a director of the various companies commencing December 1, 1952, did testify, but stated that he played no active part in arranging the advances. Accordingly, we do not have any direct testimony as to the intent or expectations of the officers involved in causing the advances to be made. Nor were there any corporate minutes with respect to the advances. Elbeco, Eastern, and the other Eastern Supply companies were subsidiaries of Baumann, and the officers and management of each was the same. This common ownership factor requires a close scrutiny *94 to determine the substance of the transaction and whether it reasonably would have been made between parties dealing at arm's length. George E. Warren Corporation v. U.S. (Ct. Cls.) 141 F. Supp. 935, and Republic Steel Corporation v. U.S., SUPRA. It seems obvious to us that Elbeco and Eastern were not dealing with each other at arm's length as would two unrelated entities, but were acting under the direction of the parent, Baumann. On brief the parties have argued the question whether the net effect of the making of the advances to Eastern was a loan or a distribution by Elbeco to its parent, Baumann and in turn a loan or a contribution of capital by Baumann to its other subsidiary, Eastern. We think it unnecessary to decide that question. Deductions depend upon legislative grace and the taxpayer must show that a claimed deduction comes within the deduction provisions of the statute. Deputy v. DuPont, 308 U.S. 488 and cases cited therein. Suffice it to say that in our opinion there was no bona fide indebtedness created which could be the subject of a bad debt deduction. We have carefully examined the cases cited by the parties, but find none of them directly *95 in point. In each case the question whether a bona fide debt existed must be determined in the light of the particular set of circumstances presented. In view of our conclusion that no debt existed, it is unnecessary to consider the respondent's alternative contention that even if there was a valid debt the petitioner has not met the burden of proving ascertainment of partial worthlessness in the year in question. Since we approve the respondent's disallowance of the claimed bad debt deduction for 1953, it follows that there was no net loss for that year which may be carried back to 1952. Decision will be entered for the respondent. Footnotes
1. In view of the actual income of Elbeco in 1952, its actual cash outlays, and the cash on hand at the beginning and end of the year, as shown in its return for the year 1952, the conclusion is inescapable that the funds necessary to make the advance of $340,000 to Eastern on December 3, 1952, must have come from the proceeds of this loan. Furthermore, it is noted that the loan was obtained on November 28, 1952, and the advance to Eastern occurred on December 3, 1952.↩
2. In its income tax return for 1953 Elbeco reported capital gain of $302,363.18 on this sale. The record does not disclose the amount of cash which it obtained as a result of this sale. In the balance sheet attached to its return Elbeco showed outstanding mortgage indebtedness of $2,851,986.93 at the beginning of the year and $1,795,201.70 at the end of the year, a decrease during the year of about $1,057,000. It would appear that of the $1,655,824.50 Elbeco actually received about $600,000 in cash, since there is no indication in the balance sheet that Elbeco took back any notes evidencing any portion of the selling price. It may be further added that in view of the actual income of Elbeco in 1953, its actual cash outlays, and the cash on hand at the beginning and end of the year, as shown in its return for the year 1953, the funds necessary to make the advance of $467,772.54 to Eastern on April 27, 1953, must have come from the proceeds of this sale. Furthermore, it is noted that the sale of this property occurred on April 24, 1953, and the advance to Eastern occurred on April 27, 1953.↩
1. Includes the advances made to it by Baumann. ↩
2. Excess of indebtedness over assets. This reflects a decrease in assets resulting from adding an amount of $792,562.35 to a reserve for loss on advances to other Eastern Supply companies.↩
1. Among deductions claimed resulting in the net loss was about $100,000 claimed as loss on termination of operations and about $875,000 claimed as loss on advances to affiliated companies (Eastern Supply companies of Charlotte, Greenville, and Columbus) ↩
2. The net loss was occasioned by claimed loss of about $157,000 on advances to affiliated company (Eastern Supply Co. of Georgia)↩
1. Does not include Newburgh and Greensboro, since returns not in evidence. ↩
2. Excess of indebtedness over assets.↩
1. Does not include experience of Eastern Supply Co., Greensboro and Newburgh, since returns not in evidence. ↩
2. Newburgh liquidated in this year. ↩
3. Greensboro liquidated in this year. ↩
4. Charlotte, Greenville and Columbus liquidated in this year. ↩
5. Georgia, last of the companies, liquidated in this year.↩
3. Section 23(k)(1) of the Internal Revenue Code of 1939 provides that there shall be allowed as deductions: Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *↩