Louis H. Lewis and Annette Lewis, et al. [1] v. Commissioner. Lewis v. Commissioner
Docket Nos. 83732, 83733, 85162, 85749, 85750, 91963, 94018, 94019.
United States Tax Court
T.C. Memo 1962-306; 1962 Tax Ct. Memo LEXIS 3; 21 T.C.M. (CCH) 1647; T.C.M. (RIA) 62306; December 31, 1962
William P. Rosenthal, Esq., 110 S. Dearborn St., Chicago, Ill., for the petitioners. Seymour I. Sherman, Esq., and Joseph T. deNicola, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: In these consolidated cases respondent determined deficiencies in income taxes of the petitioners for the taxable years and in the amounts as follows: Docket
Taxable
Number
Petitioner
Year
Deficiency
83732
Louis H. Lewis and Annette Lewis
1955
$24,316.08
1956
28,202.87
83733
Estate of Hyman Furst, Deceased, Louis H. Lewis,
Executor
1955
40,992.05
1956
42,908.03
85162
Samuel Pearl and Mary Pearl
1955
25,806.08
1956
26,976.62
1957
38,048.98
85749
Louis H. Lewis and Annette Lewis
1957
55,511.54
85750
Estate of Hyman Furst, Deceased, Louis H. Lewis,
Executor
1957
88,514.98
94018
Louis H. Lewis and Annette Lewis
1958
62,892.92
1959
65,234.85
94019
Estate of Hyman Furst, Deceased, Louis H. Lewis,
Executor
1958
96,952.86
1959
99,411.66
91963
Samuel Pearl and Mary Pearl
1958
36,720.41
1959
48,846.28
*5 The issues presented for decision are: (1) Whether petitioners are entitled to deductions as interest paid of amounts paid to Corporate Finance and Loan Corporation of Boston, Massachusetts, in 1955 and 1956. (2) If the claimed interest deductions are not allowable, whether petitioners should be allowed for 1956 and 1957 deductions for losses incurred in transactions entered into for profit or as losses incurred because of alleged fraud or misrepresentation, or, in the alternative deductions for long-term capital losses in amounts which represent the difference between the amounts received and the amounts paid out by each petitioner in the transactions. (3) Whether petitioners are entitled to deductions as premiums for borrowing bonds of amounts paid by them to M. Eli Livingstone in the taxable years 1957, 1958, and 1959. Findings of Fact Some of the facts have been stipulated and are found accordingly. Louis H. Lewis and Annette Lewis, husband and wife residing in Chicago, Illinois, filed a joint Federal income tax return on the cash basis for each of the calendar years 1955, 1956, 1957, 1958, and 1959 with the district director of internal revenue at Chicago, Illinois. *6 Samuel Pearl and Mary Pearl, husband and wife residing in Chicago, Illinois, filed a joint Federal income tax return on the cash basis for each of the calendar years 1955, 1956, 1957, 1958, and 1959 with the district director of internal revenue at Chicago, Illinois. Louis H. Lewis is a duly appointed and authorized executor of the last will and testament of Hyman Furst, deceased. Hyman Furst filed his Federal income tax returns for the calendar years 1955, 1956, 1957, 1958, and 1959 on the cash basis with the district director of internal revenue at Chicago, Illinois. Annette Lewis and Mary Pearl did not actively participate in any of the transactions here involved. Louis H. Lewis (hereinafter referred to as Lewis) and Hyman Furst (hereinafter referred to as Furst) were partners in a collection agency known as "Furst and Furst," with offices in Chicago, Illinois. Samuel Pearl (hereinafter referred to as Pearl) is an attorney with offices in Chicago, Illinois. Lewis had known Pearl for approximately 8 years in 1955. Lewis, Furst, and Pearl reported adjusted gross income for Federal income tax purposes for the years and in the amounts as follows: Year
Lewis
Furst
Pearl
1955
$ 78,270.13
$ 80,568.00
$ 97,745.60
1956
106,140.34
114,765.14
87,886.17
1957
117,217.42
120,597.76
114,247.30
1958
82,708.95
72,185.19
91,255.49
1959
101,338.92
90,881.61
107,132.97
*7 In 1955 Lewis visited Maxwell Abbell (hereinafter referred to as Abbell) for the purpose of having Abbell draw his will. Abbell discussed with Lewis the amount of his income and the portion thereof which he paid in tax and suggested that he could assist Lewis in making investments, including purchases of timber, Government securities, and certain stock, the income from which would be more favorably treated from a tax point of view. Abbell stated that he would have a gentleman call upon Lewis and shortly thereafter, Gerald G. Bolotin (hereinafter referred to as Bolotin) came to Lewis' office and Lewis learned that he had been referred to Bolotin by Abbell. Bolotin told Lewis of opportunities to buy securities which would be explained to Lewis in greater detail at subsequent meetings. Bolotin was a Chicago attorney who acted for M. Eli Livingstone in seeking to interest persons in Livingstone's plans. At all times material M. Eli Livingstone was a security dealer in Boston, Massachusetts, doing business in the form of a sole proprietorship under the name of Livingstone and Company. Both M. Eli Livingstone and Livingstone and Company will be referred to hereinafter as "Livingstone. *8 " Livingstone developed and promoted a number of plans attractive to taxpayers with large incomes, an essential feature of which was the deduction for income tax purposes of amounts characterized as consideration for the borrowing of funds or securities. Bolotin received a fee or commission for each contact produced by him for Livingstone which resulted in a transaction. Lewis, Furst, and Pearl first became aware of the activities of Livingstone through Bolotin. After his first meeting with Bolotin, Lewis held other meetings with Bolotin and with Livingstone, or with both Bolotin and Livingstone. At one of these meetings Livingstone suggested to Lewis that Lewis purchase large amounts of Government securities. This same plan was suggested by Livingstone to Pearl and Furst. Lewis asked Livingstone to outline his plan in writing so that he could study the proposal in detail. A proposal in writing was subsequently submitted to Lewis by Livingstone. While Lewis was debating the advisability of proceeding with the plan, he received a copy of a legal opinion addressed to Bolotin from a Chicago law firm. After reading the proposal, Lewis contacted Arthur Wasserman, an attorney in *9 Boston, Massachusetts, who was a friend of Lewis and asked for information about Livingstone. Wasserman stated that he knew Livingstone and told Lewis that Livingstone had been in the securities and investment business for some time, that he had been successful in that business, that he had a home that was worth about $250,000, and was quite wealthy. Lewis then discussed Livingstone's proposal and the legal opinion addressed to Bolotin with a certified public accountant in Chicago. Lewis regarded this accountant as a tax expert. The accountant examined the proposal and cautioned Lewis that if he entered the transaction, he should be certain to receive the serial numbers of the bonds, and should refuse to enter the transaction without such assurance. By letter dated November 18, 1955, Livingstone informed Lewis that he felt very strongly that the turning point in the bond market was at hand. He stated further that, historically, there is a premium for the "rollover" privilege on bonds which are held by an investor. Livingstone explained that "rollover" means the right to exchange the expiring or maturing issue for a new one which replaces it. Livingstone urged Lewis to buy United *10 States Treasury 2 7/8 percent notes because of the favorable condition and the generous yield that they offered. He stated also that the future prospect is a very substantial capital appreciation owing to the rollover privilege. Upon the basis of the information and advice he had received, Lewis decided to enter into the transactions proposed by Livingstone. His reasons for making this decision were that his income tax bracket enabled him to make good use of a deduction for interest which would not otherwise be available, the bonds purchased might acquire additional value if the Government would permit them to be exchanged on maturity for bonds of a higher interest rate, he was given an option to sell the bonds which limited his losses if the bonds declined in value, and there was the possibility of a rise in value of the bonds which might result in an economic gain to him. Lewis also considered the fact that any gain on the sale of the bonds would be taxable as a capital gain. Louis would not have entered into the transaction under the plan submitted to him by Livingstone except for the anticipated tax benefit to be derived therefrom. Petitioners Furst and Pearl relied upon Lewis' *11 investigation of Livingstone's proposals. They felt that Lewis was methodical and would explore a business proposal carefully. They also decided on November 25, 1955, to enter into the transactions proposed by Livingstone. Their decision was based largely upon Lewis' conclusion as to the advisability of entering into the transactions and their primary purpose in entering the transactions was also to reduce their Federal income taxes. Pearl also relied on the legal opinion of the Chicago law firm issued to Bolotin. On or about November 22, 1955, Lewis directed Livingstone to purchase for his account $1,000,000 face value United States Treasury 2 7/8 percent notes due March 15, 1957, with interest coupons due March 15, 1956, and September 15, 1956, detached. A letter dated November 22, 1955, sent to Lewis by Livingstone stated, in part, as follows: We have this day sold to you: $1,000,000 U.S. Treasury 2 7/8% Notes due March 15, 1957, with 3/15/56 and 9/15/56 coupons detached For $1.00 and other valuable consideration, receipt of which is hereby acknowledged, we hereby grant you an irrevocable option to sell these notes to us on September 15, 1956, at a price of 100 3/4. *12 It is intended that the above identified notes shall be used in exercising this option, and the option, if exercised, shall be exercised through the sale by you or your assigns to us of the above identified notes. Livingstone made no charge for the option to sell or "put" the Treasury notes. Enclosed in a letter from Livingstone to Lewis dated November 22, 1955, were a confirmation slip showing a purchase by Lewis of $1,000,000 United States Treasury 2 7/8 percent notes due March 15, 1957, with interest coupons due March 15, 1956, and September 15, 1956, detached at a price of 97 1/2 or a total price in the amount of $975,000, a note for Lewis' signature, letters of instruction for Lewis' signature, and the letter dated November 22, 1955, a part of which has been quoted heretofore. Also enclosed were copies of the papers for Lewis' signature for his file and Livingstone's check in the amount of $32,500 as an advance. This amount was paid to Lewis as security for the option granted to him to sell the notes to Linvingstone at a price in excess of par at maturity. Lewis did not sign a notice for this amount and it was not accounted for until the close of the transaction in 1956 when *13 it was charged to Lewis' account. Livingstone's check for $32,500 was deposited in Lewis' regular account and was not set aside in a special fund or placed in escrow. No commission was charged by Livingstone for the transaction stated to be a sale to Lewis of the $1,000,000 United States Treasury 2 7/8 percent notes. The lack of a charge for commission is customary where a broker sells Government notes as principal, and for his own account. The confirmation slip indicated that this transaction was one in which Livingstone acted as principal in the sale of the bonds. Lewis was requested to sign the note and letter of instruction and return them to Livingstone's office, together with his check in the amount of $40,218.75 made payable to Corporate Finance and Loan Corp. (hereinafter referred to as CF&L), which amount was stated to represent Lewis' prepayment of interest. By means of the prepared letters furnished him by Livingstone, Lewis directed Livingstone to deliver the notes against payment of $975,000 to CF&L and directed CF&L to pay this amount and receive the notes from Livingstone. Lewis executed an instrument dated November 22, 1955, in the form of a one-year promissory *14 note in favor of CF&L in the amount of $975,000, with interest at 4 1/8 percent per annum through November 22, 1956, in the amount of $40,218.75 having been prepaid by Lewis. The note recited that Lewis had deposited with CF&L as collateral $1,000,000 United States Treasury 2 7/8 percent notes due March 15, 1957, with March 15, 1956, and September 15, 1956, coupons detached. The note contained no provision for the reimbursement of interest in any amount to Lewis by CF&L if the principal amount were paid previous to the due date recited therein. This note contained a provision that it should be construed and interpreted in accordance with the laws of the State of Illinois, and also contained the following provisions: The undersigned gives to the obligee a lien against the securities pledged for the amount of the obligation set forth herein and gives to the obligee the right to hypothecate and use the securities pledged for any purpose while so pledged. Said right is not to be inconsistent in any manner with the ownership by the undersigned of the said collateral, and with the right of the undersigned to obtain the return of the collateral at any time upon tender of payment of the *15 amount due hereunder. The transactions were recorded on the the books of CF&L by entries showing a debit to the account entitled "Notes Receivable, Clients" and a credit entry to the account entitled "Loans Receivable [Livingstone] & Co." in the amount of $975,000. Livingstone placed an order with Salomon Brothers and Hutzler (hereinafter called Salomon), dealers in Government securities, designated as and for the account of Lewis, directing the delivery of $1,000,000 United States Treasury 2 7/8 percent notes due March 15, 1957, to the Chemical Corn Exchange Bank of New York (hereinafter referred to as Chemical Bank) against payment. The Chemical Bank was instructed by Livingstone to receive the foregoing notes from Salomon against payment. Livingstone placed an order with Salomon directing the sale for the account of CF&L, and the receipt of $1,000,000 United States Treasury 2 7/8 percent notes, due March 15, 1957, from Chemical Bank against payment. Livingstone instructed Chemical Bank to deliver the foregoing notes to Salomon covering both transactions, and Salomon issued confirmation slips to Livingstone covering both transactions. Livingstone paid Salomon the differential *16 between the purchase and sale prices. Chemical Bank credited and debited Livingstone's account in the amounts of the sale price and purchase price, respectively, of the foregoing securities, and issued a credit advice and a debit advice accordingly. It ultimately received a clearing fee for its services. The notes in question never left the office of Salomon, and neither Lewis, Livingstone, nor CF&L ever acquired actual physical possession thereof. It is common practice among security dealers to "pair off" orders to buy and orders to sell the same security, and to dispense with physical delivery except as to any net excess of purchases or sales. The confirmation slip sent to Salomon in response to Livingstone's order to deliver mentioned Lewis by name only because of Livingstone's request. This was not normally done in the usual course of Salomon's business. Lewis issued a check dated December 1, 1955, in favor of CF&L in the amount of $40,218.75. A document designated as an interest statement of CF&L dated November 22, 1955, was sent to Lewis with the following notation thereon: "Interest on loan of $975,000.00 (a) 4 1/8% for one year from 11/22/55 through 11/22/56 - $40,218.75." *17 By letter dated December 7, 1955, CF&L advised Lewis that it had received from Livingstone for Lewis $1,000,000 United States Treasury 2 7/8 percent notes due March 15, 1957, with March 15, 1956, and September 15, 1956, coupons detached, bearing certain bond sic numbers [presumably note numbers], which it purported to set forth therein. CF&L is a corporation which was organized in 1954 under Massachusetts law with $1,000 of contributed capital. Thereafter, no further capital contributions were made. Harry W. Cushing, a friend and former law associate of Livingstone, was at all times material hereto, an attorney in Boston, Massachusetts. Cushing's law office and the office of CF&L were located at all times here material, in the same premises at 70 State Street in Boston. During the period here in issue, Cushing was the president and treasurer and one of the shareholders of CF&L. All other shareholders were friends, relatives or clients of Cushing. Cushing and one of his children, who served as clerk at the directors' meetings, held three or four times each year, were the corporation's only employees. For the fiscal year ending March 11, 1956, they received salaries of $15,882 *18 and $3,975, respectively, from the corporation. The tangible assets of CF&L consisted of client folders, books and records, a supply of letterhead stationery and promissory notes executed in its favor by clients. The correspondence of CF&L was typed and prepared on its letterhead stationery by Livingstone's office, for which service CF&L paid Livingstone. Cushing's principal activities as the president and treasurer of CF&L were to receive and deposit payments from clients and pay out corporate funds. Substantially all the business of CF&L was received on reference from Livingstone. CF&L never sought or received a credit on any person with whom it did business. CF&L maintained its books and records on the basis of a fiscal year ending March 31. For its fiscal years 1955 and 1956 it filed "Certificates of Condition" with the Secretary of State of the Commonwealth of Massachusetts, showing the following assets and liabilities: Fiscal Year Ended
Fiscal Year Ended
March 31, 1955
March 31, 1956
Assets
Cash
$ 7,504.07
$ 2,783.06
Accounts Receivable Customers
65,950,323.55
280,430,957.38
Prepaid Insurance, Interest Taxes
45.99
37.47
Total Assets
$65,957,873.61
$280,433,777.91
Liabilities
Acounts Payable
$57,249,044.32
$270,812,038.97
Accrued Bond Expense
472,085.94
4,001,327.50
Deferred Interest
2,922,092.95
6,613,528.32
Bonds Borrowed
6,240,000.00
Payroll Taxes Withheld
195.00
Capital Stock, without part
1,000.00
1,000.00
Surplus
(926,349.60)
(994,311.88)
Total Liabilities
$65,957,873.61
$280,433,777.91
*19 At the end of each fiscal year, Livingstone and Cushing decided the amounts to be paid to Livingstone by CF&L for the transactions which had taken place. Livingstone sent a letter to Lewis dated September 5, 1956 enclosing the necessary documents to close out Lewis' transaction involving the $1,000,000 United States Treasury 2 7/8 percent notes due March 15, 1957. Livingstone requested Lewis to sign the enclosed instruction letters as indicated to release the notes from Lewis' account and return the papers to Livingstone's office. Livingstone stated further that on September 15, 1956, he would confirm purchase of these securities from Lewis, discharge his loan, and have his "paid and cancelled" note returned to him. Also enclosed was a statement prepared as of September 15, 1956 reflecting the status of Lewis' account. The latter indicated at the bottom of the page that a carbon copy was being sent to Maxwell Abbell. A confirmation slip dated September 15, 1956, was sent by Livingstone to Lewis, stating that Livingstone, as principal and for their own account, bought of Lewis $1,000,000 United States Treasury 2 7/8 percent notes due March 15, 1957 at 100 3/4. The confirmation *20 slip does not show any commission charged. Pursuant to Livingstone's instruction, by letter dated September 15, 1956, Lewis directed CF&L to deliver from his account to Livingstone $1,000,000 United States Treasury 2 7/8 percent notes due March 15, 1957 against a payment by Livingstone of $975,000. He also directed CF&L to use the proceeds to discharge his outstanding loan. Livingstone issued a ledger statement or statement of account to Lewis dated September 15, 1956, indicating the following: Sold or
Date
Delivered
Description
Price
Debit
Credit
Balance
9/15/56
1000M
U.S. Treasury
100 3/4
$1,007,500.00
2 7/8 percent
Notes due
March 15, 1957
Paid to the
$975,000.00
Corporate
Finance Loan
Corp. for
your account
Paid to you
32,500.00
Balance
$0.00
Thereupon CF&L made entries in its books indicative of payment of the amount of $975,000 shown thereon as due to it from Lewis and sent to Lewis, marked as paid, the instrument date November 22, 1955, in the form of the 1 year promissory note to CF&L signed by Lewis. The net out-of-pocket expense to Lewis resulting from the *21 foregoing transactions of November 22, 1955 and September 15, 1956, was in the amount of $7,718.75, the difference between the amount paid out designated as interest of $40,218.75 and the amount received from Livingstone as security for the put in the amount of $32,500 and subsequently credited to Lewis' account. Furst and Pearl entered into transactions at about the same time as Lewis identical in all material respects with those described herein with respect to Lewis, except that in the case of Furst, the face amount of the securities involved was $1,400,000; the amount designated as the purchase price and as the loan from CF&L was $1,365,000; the amount designated as interest paid to CF&L was $56,306.25; the advance by Livingstone was $45,500 and net-of-the-pocket expense was in the amount of $10,806.25. On or about March 22, 1956, Lewis, Furst and Pearl each entered into another transaction planned by Livingstone. On or about March 22, 1956, Lewis directed Livingstone to purchase for his account $1,000,000 face-value United States Treasury 2 7/8 percent notes due June 15, 1958, with interest coupons due June 15, 1956 and December 15, 1956 detached. Under date of March 22, 1956, Livingstone *22 delivered a letter to Lewis which stated, in part, as follows: We have this day sold to you: $1,000,000 U.S. Treasury 2 7/8% Notes due June 15, 1958 with 6/15/56 and 12/15/56 coupons detached. For $1.00 and other valuable consideration, receipt of which is hereby acknowledged, we hereby grant you an irrevocable option to sell these notes to us at any time from December 15, 1956, through June 15, 1957, at a price of 101. It is intended that the above identified notes shall be used in exercising this option, and the option, if exercised, shall be exercised through the sale by you or your assigns to us of the above identified notes. Livingstone made no charge for the option to sell or "put" the above-mentioned Treasury notes. On or about March 22, 1956, Livingstone advanced Lewis the amount of $36,250 by check as security for the option granted to Lewis to sell the notes to Livingstone at a price in excess of par at maturity. Livingstone sent Lewis a confirmation slip dated March 22, 1956, stating that as principal and for their own account they had sold to Lewis $1,000,000 United States Treasury 2 7/8 percent notes due June 15, 1958, with June 15, 1956 and December 15, 1956 coupons *23 detached at a price of 97 3/8 or a total price in the amount of $973,750. No commission was charged for this transaction. Lewis directed Livingstone to deliver the notes against payment of $973,750 to CF&L and directed CF&L to pay this amount and to receive these notes from Livingstone. Lewis executed an instrument dated March 22, 1956 in the form of a promissory note due August 20, 1957, in favor of CF&L in the amount of $973,750 "with interest at the rate of 4 1/4% per annum, through August 20, 1957, in the amount of $58,397.93, of which $44,022.93" was recited as having been paid, and the coupons maturing on June 15, 1957, having a value of $14,375 were assigned to CF&L. The instrument stated further that the obligation of Lewis to prepay interest was limited to $44,022.93, that Lewis would not be obligated to make any payment of the assigned interest coupons, and that Lewis deposited as collateral with CF&L $1,000,000 United States Treasury 2 7/8 percent notes due June 15, 1958, with June 15, 1956 and December 15, 1956 coupons detached. The note contained no provision for the reimbursement of interest in any amount to Lewis by CF&L if the principal amount were paid previous *24 to the due date recited therein. It contained a provision that it should "be construed and interpreted in accordance with the laws of the State of Illinois," and also contained the following provision: The undersigned gives to the obligee a lien against the securities pledged for the amount of the obligation set forth herein and gives to the obligee the right to hypothecate and use the securities pledged for any purpose while so pledged. Said right is not to be inconsistent in any manner with the ownership by the undersigned of the said collateral and with the right to the undersigned to obtain the return of the collateral at any time upon tender of payment of the amount due hereunder. The undersigned shall not be called upon to furnish additional collateral during the term of this Note. CF&L made a debit entry on its books in the amount of $973,750 to the account entitled "Notes Receivable, Clients" and a credit entry in the same amount to the account entitled "Loans Receivable, Livingstone & Company." Livingstone placed an order with Salomon designated as for the account of Lewis directing the delivery of $1,000,000 United States Treasury 2 7/8 percent notes due June 15, 1958 to *25 the Chemical Bank against payment. Livingstone instructed the Chemical Bank to receive the foregoing notes from Salomon against payment. Livingstone placed an order with Salomon directing the sale for the account of CF&L and the receipt of $1,000,000 United States Treasury 2 7/8 percent notes due June 15, 1958 from the Chemical Bank against payment. Livingstone instructed the Chemical Bank to deliver the foregoing notes to Salomon against payment. Livingstone issued confirmation slips to Salomon covering both transactions, and Salomon issued confirmation slips to Livingstone covering both transactions. Livingstone paid Salomon the difference between the purchase and the sales price. The Chemical Bank credited and debited Livingstone's account in the amounts of the sale price and purchase price, respectively, of these securities, and issued a credit advice and a debit advice accordingly. It ultimately received a clearing fee for its services. The notes never left the office of Salomon, and neither Lewis, Livingstone, nor CF&L ever acquired actual physical possession thereof. It is common practice among security dealers to "pair off" orders to buy and orders to sell the same *26 security, and to dispense with physical delivery, except as to any net excess of purchases or sales. The confirmation slips sent to Salomon in response to Livingstone's order to deliver mentioned Lewis by name only because of Livingstone's request. This was not normally done in the usual course of Salomon's business. On May 15, 1956, Lewis issued a check to CF&L in the amount of $44,022.93. CF&L in a letter to Lewis dated June 14, 1956 set forth the serial numbers of the $1,000,000 United States Treasury 2 7/8 percent notes of June 15, 1958, with June 15, 1956 and December 15, 1956, coupons detached which were stated in this letter to have been received by CF&L from Livingstone for Lewis' account. On March 4, 1957, Lewis advised Livingstone that he wished to exercise the option granted to him on March 22, 1956, on the following day. A confirmation slip dated March 5, 1957 was sent to Lewis by Livingstone stating that Livingstone as principal and for their own account bought $1,000,000 United States Treasury 2 7/8 percent notes due June 15, 1958, at 101, plus $6,318.68 interest, making a total of $1,016,318.68. The confirmation slip does not show any commission charged. *27 By letter dated March 5, 1957, Lewis directed CF&L to deliver from his account to Livingstone $1,000,000 United States Treasury 2 7/8 percent notes due June 15, 1958, against payment from Livingstone of $980,068.68. Lewis further requested that these proceeds be used to discharge his obligation to CF&L in the amount of $973,750 plus interest due of $6,318.68. By letter of the same date Lewis directed Livingstone to receive from his account at CF&L these Treasury notes against payment to them of $980,068.68. A ledger statement or statement of account from Livingstone to Lewis dated March 5, 1957, reflects the following: Sold or
Date
delivered
Description
Price
Debit
Credit
Balance
March 5,
$1,000,000
U.S.
101
$1,016,318.68
1957
Treasury
2 7/8
percent
notes due
June
15, 1958
Cash
$980,068.68
Balance
$36,250.00
(check
enclosed)
CF&L sent Lewis a statement of the account of Lewis
with CF&L dated March 5, 1957, which
showed the following: Note dated March 22, 1956
$973,750.00
Interest due to cover period December 15, 1956
through March 5, 1957
6,318.68
Total
$980,068.68
*28 RECEIVED PAYMENT March 5, 1957 (Signed) Harry N. Cushing CF&L made entries in its books showing a payment in the amount of $973,750 to it by Lewis and sent to Lewis marked as paid, the instrument dated March 22, 1956, in the form of a promissory note to CF&L signed by Lewis. The net out-of-pocket expense to Lewis resulting from these transactions was in the amount of $7,772.93, which amount represents the difference between the amount paid by Lewis to CF&L less the amount of $36,250 received by Lewis from Livingstone. Furst and Pearl entered into transactions at or about the same time as Lewis identical in all material respects with those which Lewis entered into, except that in the case of Furst, the face amount of the securities involved was $1,250,000; the amount designated as the purchase price and as the loan from CF&L was $1,217,187.50; the amount designated as interest paid to CF&L was $55,028.66; the advance by Livingstone was in the amount of $45,312.50; and the net out-of-pocket expense was in the amount of $9,716.16. Livingstone sent Lewis a letter dated January 4, 1957, outlining a proposal for the short sale of United States Treasury bonds and the purchase *29 of United States Treasury notes and enclosing a memorandum indicating the tax consequences of the plan to an individual filing a joint income tax return whose top income tax bracket was 90 percent. The memorandum indicated a net after tax profit in the amount of $35,094.53 to such an individual on a combination short sale of $1,000,000 United States Treasury 2 3/4 percent bonds and a purchase of $1,000,000 United States Treasury 1 1/2 percent notes. In a letter to Lewis dated May 6, 1957, Livingstone agreed to defend, at his own expense, any litigation which might arise in connection with any challenge by the Treasury Department with regard to any phase of the transaction involving the combination short sale of the United States Treasury bonds and the purchase of United States Treasury notes. In a second letter to Lewis dated May 6, 1957, Livingstone stated that he was clarifying and amplifying the transaction for the sale by Lewis of United States Treasury 2 3/4 percent bonds and purchase of United States Treasury notes. This letter further stated: 1. It is our understanding that the 1 1/2% Notes are owned by you, and that in the event that you return to us the 2 3/4% Bonds at *30 any time, we are obligated to return to you or your order the 1 1/2% Notes and any cash collateral remaining to your credit. 2. It is our further understanding that we have agreed to accept the 1 1/2% Notes and the cash deposited by you, as sufficient collateral, with the full realization that this cash deposit will be utilized for the payment of future coupon expense, and with the understanding that we are not to have the right to call for additional collateral at any time. On or about May 7, 1957, Lewis instructed Livingstone to sell short for his account $3,000,000 United States Treasury 2 3/4 percent bonds due September 15, 1961, and to sell to him $3,000,000 United States Treasury 1 1/2 percent notes due October 1, 1961. By letter dated May 6, 1957, Lewis directed Livingstone Securities Corporation to deliver to Salomon for his account $3,000,000 United States Treasury 2 3/4 percent bonds due September 15, 1961, against payment from Salomon of $2,922,105.98. By letter of the same date Lewis directed Salomon to receive from Livingstone Securities Corporation these securities against payment. Livingstone placed an order with Salomon, designated as for the account of Lewis, *31 for the sale to Salomon of $3,000,000 United States Treasury 2 3/4 percent bonds due September 15, 1961. A confirmation slip dated May 7, 1957, from Salomon to Lewis indicated that Salomon, as principal, purchased from Lewis $3,000,000 United States Treasury 2 3/4 percent bonds at 97. The principal amount came to $2,910,000 and the accrued interest was $12,105.98, making a total of $2,922,105.98. At the bottom of the slip the following appeared: Del'y Terms 5/8/57 IN NY (a) CHILDS A confirmation slip showing a contract date of May 6, 1957, from Livingstone to Lewis indicated that Livingstone, acting as agent for another, sold to Lewis $3,000,000 United States Treasury 1 1/2 percent notes of October 1, 1961, at 91 5/8. The principal amount was $2,748,750 and interest $4,549.18, making a total of $2,753,299.18. No commission was charged. Simultaneously, Livingstone Securities Corporation, an entity controlled by Livingstone, placed an order with C. S. Childs & Co. (hereinafter called Childs) dealers in Government securities, for the purchase by it from Childs of $3,000,000 United States Treasury 2 3/4 percent bonds due September 15, 1961, and their delivery against payment to *32 Salomon for the account of Lewis. Livingstone instructed Salomon in a letter dated May 7, 1957, to receive from Childs the $3,000,000 United States Treasury 2 3/4 percent bonds against payment to Childs of $2,922,105.98. By a letter to Livingstone dated May 8, 1957, Lewis acknowledged receipt of the same United States Treasury 2 3/4 percent bonds which had been purchased from Childs and simultaneously sold to Salomon. Lewis agreed that in return for the "loan" of these securities he would deposit with LivingstoneUnited States Treasury 1 1/2 percent notes in the face amount of $3,000,000. Lewis further agreed that he would deposit with Livingstone cash in the amount of $168,806.80 to be applied together with coupons earned on the United States Treasury 1 1/2 percent notes to reimburse Livingstone for coupons due Livingstone on the securities "borrowed" by Lewis. The amount of $168,806.80 represents the excess of the amount realized on the sale of the 2 3/4 percent notes and on the amount paid for the 1 1/2 percent notes. Any balance remaining in Lewis' favor on September 15, 1961, was to be accounted for by Livingstone. Lewis further agreed to pay Livingstone for the "loan" of *33 the United States Treasury 2 3/4 bonds a premium in the amount of $33,750 of which $8,437.50 was stated to be paid in advance, and a balance of $25,312.50 was to be paid in equal installments on or before August 1, 1957, October 1, 1957, and December 1, 1957. By letter dated May 8, 1957, Livingstone acknowledged receipt from Lewis of $3,000,000 United States Treasury notes of October 1, 1961, and $168,806.80 in cash. The letter further stated: The cash deposit in the amount of $168,806.80 together with coupons earned by you on the securities, is to be deposited with us as security to reimburse us for coupons on the securities loaned to you. We agree that neither we nor any of our agents will call for the return of the securities loaned to you until September 15, 1961, and that neither we nor any of our agents will call upon you for any additional collateral during the term of this contract, and that you shall not be liable for the return of these securities unless the securities deposited by you shall be returned simultaneously. In consideration, we are to receive the sum of $33,750.00 as premium for the loan of securities to cover your short position, of which $8,437.50 is *34 payable in advance, and the balance of $25,312.50 is to be paid as follows: $8,437.50 on or before August 1, 1957 $8,437.50 on or before October 1, 1957 $8,437.50 on or before December 1, 1957 The ledger sheet of Lewis' account with Salomon as of May 9, 1957, reflects the following: Bought or
Sold or
Date
received
delivered
Description
Price
May 8, 1957
$3,000,000
U.S. Treasury
97
2 3/4 percent
notes due
Sept. 15, 1961
May 9, 1957
$3,000,000
U.S. Treasury
RCD
2 3/4 percent
notes due
September 15,
1961
Date
Debit
Credit
Balance
May 8, 1957
$2,922,105.98
$2,922,105.98 CR
May 9, 1957
$2,922,105.98
.00 *
By letter dated May 21, 1957, Livingstone Securities Corporation informed Lewis that, in connection with their confirmation to Lewis of the $3,000,000 United States Treasury 1 1/2 percent notes of October 1, 1961, and their delivery for Lewis' account of $3,000,000 United States Treasury 2 3/4 percent bonds of September 15, 1961, Livingstone Securities Corporation had acted solely as the agent of Livingstone and that Lewis had no responsibility to Livingstone *35 Securities Corporation whatsoever. The letter stated further that the corporation had not loaned Lewis any securities nor was it holding any securities belonging to Lewis; that his contract was with Livingstone and Company and that his sole responsibility was to that separate corporation. In letters dated in June and July 1957, from Livingstone to Lewis numbers for 2 3/4 percent bonds and 1 1/2 percent bonds stated to have been loaned to Lewis and held for Lewis were listed. During 1957 Lewis issued four checks to Livingstone, each in the amount of $8,437.50. By letter dated January 15, 1958, Livingstone issued the following statement of account to Lewis: For your 1957 Income Tax purposes, we submit the following: On the $3,000,000 U.S. Treasury 2 3/4% Bonds of 9/15/61, borrowed from us on May 8, 1957, we debited your account with the following expense: 9/15/57 Coupons
$41,250.00
Less Accrued Interest
12,105.98
Net Expense
$29,144.02 On the $3,000,000 U.S. Treasury 1 1/2% Notes of October 1, 1961, being held as collateral by us, you had the following income: 10/1/57 Coupons
$22,500.00
Less Accrued Interest
4,549.18
Net Income
$17,950.82
*36 A premium of $33,750.00 was paid for borrowing the 2 3/4% Bonds as follows: $8,437.50 on June 18, 1957 $8,437.50 on August 1, 1957 $8,437.50 on September 30, 1957 $8,437.50 on December 3, 1957 which is deductible from your Federal Income Tax. By a letter dated January 15, 1959, Livingstone issued the following statement of account to Lewis: For your 1958 Income Tax purposes, we submit the following: On the $3,000,000 U.S. Treasury 2 3/4% Bonds of September 15, 1961, borrowed from us on May 8, 1957, we debited your account with the following expense: 3/15/58 Coupons
$41,250.00
9/15/58 Coupons
41,250.00
Total Expense
$82,500.00 On the $3,000,000 U.S. Treasury 1 1/2% Notes of October 1, 1961, being held by us as collateral, you had the following income: 4/1/58 Coupons
$22,500.00
10/1/58 Coupons
22,500.00
Total Income
$45,000.00 Your net deduction on this transaction is $37,500.00. By a letter dated January 14, 1960, Livingstone issued the following statement of account to Lewis: For your 1959 Income Tax purposes, we submit the following: On the $3,000,000 U.S. Treasury 2 3/4% Bonds of September 15, 1961, borrowed from us on *37 May 8, 1957, we debited your account with the following expense: 3/15/59 Coupons
$41,250.00
9/15/59 Coupons
41,250.00
Total Expense
$82,500.00 On the $3,000,000 U.S. Treasury 1 1/2% Notes of October 1, 1961, being held by us as collateral, you had the following income: 4/1/59 Coupons
$22,500.00
10/1/59 Coupons
22,500.00
Total Income
$45,000.00 Your net deduction on this transaction is $37,500.00. Furst and Pearl entered into transactions at or about the same time as Lewis involving 2 3/4 percent bonds and 1 1/2 percent notes identical in all material respects with those described with respect to Lewis, except that in the case of Furst the face amount of the bonds stated to have been sold short and borrowed and the notes stated to have been purchased was $4,000,000; the amounts designated as the selling price of the bonds and purchase price of the notes were $3,986,141.30 and $3,655,000, respectively; the amounts designated as payments to Livingstone in 1957, 1958, and 1959 were $83,858.70, $110,000, and $110,000, respectively; and the amounts reported as interest income on the United States Treasury notes in 1957, 1958, and 1959 were $23,934.43, *38 $60,000, and $60,000, respectively. Lewis and Pearl entered into the 1957 transactions for the purpose of effecting a tax savings, and with the hope of obtaining an economic gain if the 2 3/4 percent bonds depreciated sufficiently in value. They believed that the transactions initiated in May 1957 would be carried out as set forth in Livingstone's letter of January 4, 1957. Lewis and Pearl were unaware of the financial condition of CF&L and of the fact that the securities involved in the transactions of November 1955 and March 1956 were simultaneously purchased for their accounts and sold for the account of CF&L. On and after May 7, 1957, Lewis and Pearl followed the prices of United States Treasury 2 3/4 percent bonds in the daily market reports. In his income tax return for the year 1955 Lewis deducted $40,218.75 as interest paid to CF&L and in his income tax return for the year 1956 deducted $44,022.93 as interest paid to CF&L. In his income tax return for 1957, Lewis deducted the amount of $29,144.02 as "Cost of Borrowing U.S. Treasury Bonds" and the amount of $33,750 as "Premium paid for borrowing U.S. Treasury Bonds." In his 1958 income tax return Lewis deducted $82,500 *39 as "Cost of borrowing U.S. Treasury Bonds" and in his 1959 income tax return deducted $82,500 as "Cost of borrowing U.S. Treasury Bonds." In his notices of deficiency respondent disallowed the claimed interest deductions for 1955 and 1956 and the claimed deductions for 1957, 1958, and 1959 for premiums paid for and costs of borrowing United States Treasury bonds with the explanation that the amounts so claimed are not deductible under any section of the Internal Revenue Code of 1954. In his income tax return for 1955, Furst deducted $56,306.25 as interest paid to CF&L and in his income tax return for 1956, he deducted $55,028.66 as interest paid to CF&L. In his income tax return for 1957 Furst deducted $45,000 as "Premium paid for loan of securities to cover short position," and $55,000 as "Coupon expense on $4,000, 000 U.S.T. 2 3/4% Notes due 9/15/61." In his income tax return for 1958 Furst deducted $110,000 as "coupon expense - cost of short position," and in his income tax return for 1959 deducted $110,000 with the same explanation. Respondent in his notices of deficiency disallowed the claimed interest deductions for 1955 and 1956 and the claimed deductions *40 for coupon expense and cost of borrowing bonds for 1957, 1958, and 1959 with the explanation that these amounts were not deductible under any provision of the Internal Revenue Code of 1954. In his income tax return for 1955 Pearl deducted $40,218.75 as interest paid to CF&L and in his income tax return for 1956 deducted $44,022.93 as interest paid to CF&L. In his income tax return for 1957, Pearl deducted $29,144.02 and $33,750 as "the cost of borrowing U.S. Treasury Bonds" and "Premium paid for borrowing U.S. Treasury Bonds." In his income tax return for 1958, Pearl deducted $82,500 for "cost of borrowing U.S. Treasury Bonds" and in his income tax return for 1959 deducted $82,500 with this same explanation. Respondent in his notices of deficiency disallowed the deductions claimed as interest paid to CF&L during 1955 and 1956 and the deductions claimed in 1957, 1958, and 1959 as cost of borrowing Treasury bonds and premiums paid for borrowing United States Treasury bonds with the explanation that the amounts were not deductible under any provision of the Internal Revenue Code of 1954. The parties have agreed that if the interest deductions claimed by each petitioner for 1955 *41 and 1956 are not allowed, each petitioner's taxable income for the years 1956 and 1957 should be reduced by the amounts reported by him as long-term capital gains in those years as follows: Petitioner
1956
1957
Lewis
$32,500.00
$36,250.00
Furst
45,500.00
45,312.50
Pearl
32,500.00
36,250.00
The parties have agreed that if the deductions claimed for cost of borrowing United States Treasury bonds by each petitioner in 1957, 1958, and 1959 are not allowed, each petitioner's taxable income for the years 1957, 1958, and 1959 should be reduced by the amounts reported by him as interest income received on the 1 1/2 percent notes in those years, as follows: Petitioner
1957
1958
1959
Lewis
$22,250.00
$45,000
$45,000
Furst
30,000.00
60,000
60,000
Pearl
17,950.82
45,000
45,000
Opinion The facts with respect to the claimed interest deduction for 1955 and 1956 in each of these consolidated cases are in all material respects the same as the facts in Perry A. Nichols, 37 T.C. 772 (1962) on appeal (C.A. 5, February 15, 1962). In that case we held that there was no actual purchase of Government securities, that the *42 petitioner's loans from CF&L were wholly lacking in substance since CF&L had no funds to lend and, therefore, no payment was made of "interest" on "indebtedness" to CF&L within the meaning of section 163 of the Internal Revenue Code of 1954. [2]
In the instant case, Livingstone directed the simultaneous purchase and sale of large amounts of Government notes. There was no actual purchase of Government notes; merely a purchase and offsetting sale of the same notes on the same day. CF&L was in no position to make loans of the magnitude required, and, in fact, the evidence clearly shows that the funds used to pay for the notes ostensibly purchased were generated by the simultaneous sale of the same notes. Perry A. Nichols, supra, is controlling and dispositive of the issue of the claimed interest deductions in 1955 and 1956. The transactions here described were similarly lacking in substance and were shams which can have no effect for tax purposes. Eli D. Goodstein, 30 T.C. 1178 (1958), *43 affd. 267 F. 2d 127 (C.A. 1, 1949); George C. Lynch, 31 T.C. 990 (1959), aff. 273 F. 2d 867 (C.A. 2, 1959); Leslie Julian, 31 T.C. 998 (1959), affd. 273 F. 2d 867 (C.A. 2, 1959); and Becker v. Commissioner, 277 F. 2d 146 (C.A. 2, 1960), affirming on this issue a Memorandum Opinion of this Court. Petitioners contend that since CF&L did not have sufficient funds to loan to petitioners to purchase the notes, it used a conventional method to finance the transaction, that of the short sale. In effect, petitioners argue that the simultaneous sale by CF&L of the notes purchased from Salomon was a short sale. Their interpretation of the facts indicates that CF&L borrowed petitioners' notes in order to effect a short sale. The evidence of record does not support this contention. There is no evidence of a short sale by CF&L on November 22, 1955, or on March 22, 1956. The only evidence bearing on this issue is that which points to a simultaneous sale of the securities purchased on those dates. CF&L did not purchase securities to close out or cover the transactions, but merely through bookkeeping entries accounted *44 to petitioners for the proceeds of the purported loan. Petitioners further contend that their purpose in entering these transactions was to make a profit on the rise in prices of the 2 7/8 percent United States Treasury notes. Petitioners offer no support for their purported belief that there might be a substantial increase in the prices of the notes. See Egbert J. Miles, 31 T.C. 1001 (1959). They also argue that the possibility of a rollover or the opportunity to exchange their notes of a lesser interestpaying face for notes of a higher interest value indicates that this was a profit-seeking transaction. There is no evidence to show any reasonable basis for petitioners to believe that any economic gain could result to them from these transactions aside from the tax benefit they hoped to obtain. There was nothing of substance to be gained by petitioners from the entire transaction other than a tax deduction. Cf. Knetsch v. United States, 364 U.S. 361 (1960). However, even if some reasonable expectation of an economic gain had existed, this fact would not cause any real indebtedness by petitioners to CF&L to exist on which interest was paid. Cf. Rubin v. United States, 304 F. 2d 766 *45 (C.A. 7, 1962). Petitioners contend that if the amounts claimed by them as interest paid for 1955 and 1956 are not deductible, they should be allowed to deduct in 1956 and 1957 their out-of-pocket losses which occurred on the conclusion of the transactions of those years. The out-of-pocket losses or expenses result from the difference in the amount each petitioner paid to CF&L and the amount each received from Livingstone. Petitioners first contend that the net out-of-pocket losses or expenses are deductible as an ordinary loss on a transaction entered into for profit, under section 165(c)(2) of the Internal Revenue Code of 1954. [3]
Petitioners argue that they expected to make an after-tax profit on *46 these transactions and that, therefore, the transactions were entered into for profit. The evidence does not support petitioners' contention. The facts show that the only profit petitioners could reasonably expect was in tax benefit. In Eli D. Goodstein, supra 30 T.C. 1178, 1192-1193) we stated: * * * Since the petitioner did not intend to purchase and did not purchase any Treasury notes, it cannot be said that there was a transaction entered into for profit within the meaning of section 23(e) of the Internal Revenue Code of 1939. [now section 165(c) of the Internal Revenue Code of 1954] * * * It is clear that the type of transaction to which the statute refers is one which has substance and in which there is a true motive of deriving a profit. * * * Our holdings in Eli D. Goodstein, supra, and in Morris R. DeWoskin, 35 T.C. 356 (1960) that a transaction may not be considered as a transaction entered into for profit if the only economic gain to be derived therefrom results from anticipated tax reduction are controlling here. Petitioners next contend that their out-of-pocket losses are attributable to misrepresentations *47 by Livingstone as to the manner in which the transactions would be carried out. Petitioners contend that such alleged misrepresentations border on fraud and that such fraud is an additional ground for allowing a deduction of the out-of-pocket losses. Had each transaction proceeded precisely in accordance with Livingstone's prospectus, petitioners would have suffered the identical out-of-pocket losses that they did in fact realize. No part of such losses can be said to be due to any alleged misrepresentation of Livingstone. Cf. Miles v. Livingstone, 301 F. 2d 99 (C.A. 1, 1960). Petitioners further contend that they are entitled to deductions for out-of-pocket losses as long-term capital losses under the decision in Becker v. Commissioner, supra, and MacRae v. Commissioner, 294 F. 2d 56 (C.A. 9, 1961). Although their argument is not spelled out, it would necessarily involve section 1234 of the Internal Revenue Code of 1954[4] (the predecessor section 117(g)(2) of the 1939 Code was in issue in Becker and MacRae). *48 Section 1234 is clearly inapplicable to petitioners' out-of-pocket losses. Here there was no loss attributable to the sale or exchange of an option, nor was there a loss attributable to the failure to exercise an option. In both the taxable years 1956 and 1957 petitioners exercised their options with Livingstone. We hold that petitioners are not entitled to deductions in 1956 and 1957 for their out-of-pocket losses on the transactions with Livingstone in 1955 and 1956. The final question presented here is whether petitioners are entitled to deductions in the taxable years 1957, 1958, and 1959 for amounts claimed as a premium paid Livingstone for borrowing United States Treasury 2 3/4 percent bonds in connection with the alleged short sale of these bonds in 1957 and for payments of interest in 1957, 1958, and 1959 in connection with carrying a short position in these bonds. Petitioners' position with respect to the claimed deductions for premiums paid and costs of borrowing bonds is that they made a purchase of United States Treasury 1 1/2 percent notes in 1957 and at the same time made a short sale of United States Treasury 2 3/4 percent bonds using the 1 1/2 percent notes as *49 collateral for the loan from Livingstone of the 2 3/4 percent bonds sold short. They argue that payments to Livingstone of a premium for the loan of the 2 3/4 percent bonds and the annual interest payments on the short sale are deductible under section 212 of the Internal Revenue Code of 1954. [5]
Respondent replies that petitioners' dealings with Livingstone were formulated and executed solely with reference to tax-saving purposes, were entirely without substance, and should be disregarded for Federal income tax purposes. Respondent denies that in fact a short position was ever held and that securities were ever borrowed. We agree with respondent's contention. On May 7, 1957, Salomon confirmed the purchase of $3,000,000 in United States Treasury 2 3/4 percent bonds from Lewis at a total price of $2,922,105.98. The confirmation slip indicates that this amount would be paid on the following day *50 in New York at Childs. On the same day, May 7, 1957, Livingstone placed an order with Childs for the purchase by it from Childs of $3,000,000 United States Treasury 2 3/4 percent bonds and their delivery against payment to Salomon for the account of Lewis. As a result of this simultaneous transaction, the short sale by Lewis of the 2 3/4 percent bonds was immediately canceled by the purchase of the identical bonds from another broker. Lewis' account with Salomon indicates that his credit balance resulting from the sale of the bonds was cleared on the following day by the delivery to Salomon of the identical bonds. No proof has been offered that Livingstone owned bonds of this kind in the amounts which he could loan Lewis or that Livingstone possessed funds in sufficient amount to purchase such bonds and lend them to petitioners. Nor is there any evidence that he did lend Lewis these bonds. Thus, the record indicates that Lewis never borrowed securities from Livingstone and that Lewis did not maintain a short position with regard to these bonds. We conclude that these transactions considered as a whole, had no independent economic or business purpose apart from anticipated tax benefits *51 and were wholly without substance. Eli D. Goodstein, supra.Cf. Empire Press, Inc., 35 T.C. 136 (1960); Egbert J. Miles, supra; MacRae v. Commissioner, supra; and Perry A. Nichols, supra. Petitioners contend that the record demonstrates that they purchased the 1 1/2 percent Treasury notes in 1957 and that there is nothing in the record to show that these notes were disposed of during the period here involved. The record does not support petitioners' contention. There is no evidence to show that these bonds were ever actually purchased by petitioners. However, even if petitioners had actually purchased the 1 1/2 percent notes, they would not be entitled to deduct costs of maintaining a short position in 2 3/4 percent bonds which they had not in fact borrowed. We sustain respondent in his disallowance of the deductions claimed by petitioners as premiums paid and costs of borrowing United States Treasury bonds in the years 1957, 1958, and 1959. Decision will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Louis H. Lewis and Annette Lewis, Docket Nos. 83732, 85749, and 94018; Estate of Hyman Furst, Deceased, Louis H. Lewis, Executor, Docket Nos. 83733, 85750, and 94019; and Samuel Pearl and Mary Pearl, Docket Nos. 85162 and 91963.↩
2. SEC. 163↩. INTEREST. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.
3. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - * * *
(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and * * *↩
4. SEC. 1234. OPTIONS TO BUY OR SELL. (a) Treatment of Gain or Loss. - Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).↩
5. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; * * *↩