**Eli D. GOODSTEIN et al., Petitioners,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Respondent.**

**COMMISSIONER OF INTERNAL REV-ENUE, Petitioner,**

v.

**Eli D. GOODSTEIN et al., Respondents.**

**Nos. 5458, 5459.**

United States Court of Appeals
First Circuit.

May 21, 1959.

John P. Allison, New York City, with whom Stanley W. Herzfeld and Marshall, Bratter, Greene, Allison & Tucker, New York City, on brief, for Eli D. Goodstein et al.

Grant W. Wiprud, Attorney, Department of Justice, Washington, D. C., with whom Charles K. Rice, Asst. Atty. Gen., and Lee A. Jackson and Harry Baum, Attorneys, Department of Justice, Washington, D. C., on brief, for Commissioner of Internal Revenue.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

These are petitions for review of a decision of the Tax Court of the United States, 30 T.C. 1178. Petition No. 5458 is by the taxpayers from that part of the Tax Court's decision finding deficiencies in their income tax for the years 1952 and 1953. Petition No. 5459 is by the Commissioner solely for protective purposes in the event the taxpayers are successful in their petition.[1] The tax-

---

1. As the Tax Court held that the taxpayers could not deduct interest payments on a loan, purported to have been made to them in order to purchase Treasury notes, because in fact there had been no actual purchase of the Treasury notes or loan, it excluded from taxpayers' gross income the amount designated as interest income from the Treasury notes. Consequently if the Tax Court was in error and the interest deductions are allowable, its exclusion of the interest income from the Treasury notes should also be reversed.

payers, who filed joint returns, are husband and wife and reside in Fitchburg, Massachusetts. The husband, Eli D. Goodstein, will be hereinafter called the taxpayer. These deficiencies resulted from the disallowance as a deduction from gross income under Section 23(b) of the Internal Revenue Code of 1939, 53 Stat. 12 (1939), 26 U.S.C. § 23(b) (1952),[2] of interest allegedly paid on loans made to the taxpayer to finance the taxpayer's purchase of $10,000,000 in face amount of United States Treasury 1⅜% notes maturing on March 15, 1954.

The Tax Court held that the arrangements under which the taxpayer purported to borrow the money necessary for this purchase of Treasury notes were part of a preconceived plan which lacked substance and should be ignored for tax purposes. It also found that even if there was an actual borrowing of money and purchase of Treasury notes, there were no actual payments of interest made by the taxpayer, who was on the cash basis, during 1952 and 1953.

There is little controversy as to most of the facts in the record. The dispute is as to whether these facts require the inference that there were payments of interest on an indebtedness recognizable under Section 23(b).

The essential relevant facts relied upon by the Tax Court and by the taxpayer are as follows: In October 1952 the taxpayer, who is an accountant by profession and also a corporate executive, met M. Eli Livingstone, a Boston broker and dealer in securities. They discussed a possible purchase by the taxpayer of a substantial amount of government securities, the financing thereof by means of a small down payment and a loan for the balance and the income tax consequences of such a transaction. With regard to the latter point, the taxpayer was shown two letters, one of which was dated June 30, 1952 from a Deputy Commissioner of Internal Revenue to Livingstone and the other dated September 26, 1952 from an Assistant Commissioner and addressed to Mrs. Louise F. Livingstone. The second of these letters expressly indicated that a transaction substantially similar to that followed by the taxpayer here would result in any interest payments being deductible from the taxpayer's gross income and the gain realized from the sale of the notes if held for more than six months would be treated as a long term capital gain. Following further negotiations it was agreed that the taxpayer would make a down payment of $15,000 for the $10,000,000 face value Treasury notes and that Livingstone would arrange the loan for the balance.

On October 27, 1952, taxpayer ordered Livingstone to purchase for him $10,000,000 in face value of the Treasury notes. Livingstone after the receipt of taxpayer's check for $15,000 instructed the Guaranty Trust Company of New York, with which Livingstone had a security clearance account, to receive from C. J. Devine & Co., bond dealers, $10,000,000 face value Treasury notes. At the time of delivery of the notes to the bank, it debited Livingstone's account $9,929,212.71 and credited C. J. Devine & Co.'s account with the bank a corresponding amount.[3] Within a half hour the bank, pursuant to Livingstone's order, redelivered the Treasury notes to

---

**2.** "§ 23. *Deductions from gross income.*
"In computing net income there shall be allowed as deductions:
&ast; &ast; &ast; &ast; &ast;
"(b) *Interest.*
"All interest paid or accrued within the taxable year on indebtedness, &ast; &ast; &ast;."

**3.** The taxpayer contends that by the extension of this credit by the bank he assumed a personal obligation to repay this amount and this potential liability is an element indicative of the substantial nature of the entire transaction. He concedes, however, that the enforcement of this liability was unlikely. This concession, if anything, is an understatement when we analyze the nature of this potential liability. The credit was extended for approximately half an hour during which period the creditor, the bank, had in its possession $10,000,000 face value Treasury notes which had a market value approximately equal to the credit extended.

Devine who paid for them with a certified check on its Guaranty Trust account equal to the credit previously received by it minus a commission of $1,562.50. The taxpayer has not indicated what was done with this certified check but it would seem reasonable to assume that the bank utilized it to offset the credit it had extended to Livingstone.[4]

On this same date, October 27, 1952, the taxpayer executed a promissory note to Seaboard Investment Corp. for $9,914,-212.71 payable on March 15, 1954 with interest at 2⅜% per annum. The note recited that the taxpayer pledged with Seaboard as security the $10,000,000 Treasury notes and gave Seaboard the right " * * * to hypothecate and use the securities pledged for any purpose while so pledged. Said right is not to be inconsistent in any manner with the ownership by the undersigned of said collateral, and with the right to the undersigned to obtain the return of the collateral at any time upon tender of payment of the principal and interest due hereunder." The taxpayer also directed Livingstone as his broker to deliver the Treasury notes to Seaboard "against payment by them (Seaboard) of $9,914,-212.71," the amount of the promissory note. This step was not taken because Seaboard did not have any funds remotely approaching $9,914,212.71. Seaboard was a corporation formed in 1952 whose president was Samuel Livingstone, brother of M. Eli Livingstone, and whose sole function appeared to be to "finance" transactions such as this. To pay Livingstone for these Treasury notes, Seaboard ordered Livingstone, without the knowledge of the taxpayer, to sell these notes and Livingstone issued a confirmation slip stating that as agent for Seaboard he sold for Seaboard $10,000,000 face value of Treasury notes at 99%4 for a net selling price of $9,915,150.21. It is

taxpayer's contention that in effect Seaboard obtained the funds necessary to make the loan to the taxpayer by taking a short position in the Treasury notes for Seaboard's own account. On its books Seaboard recorded this transaction by debiting its asset account, Notes Receivable from Eli D. Goodstein—$9,914,-212.71 and crediting its liability account to Livingstone & Company, the same amount. It would seem that as Livingstone & Company had been acting for Goodstein in "delivering" Goodstein's notes to Seaboard, any short sale which borrowed these notes in order to make delivery would result in the notes being owed to Livingstone only in his capacity as agent for Goodstein.

On October 30, 1952, taxpayer issued a check for $40,000 to Seaboard which bore the notation that it was in part payment of interest on his promissory note. Another check for the same purpose but for $10,000 was drawn on December 12, 1952. Taxpayer then deducted $50,000 as interest on his tax return for the year 1952. Shortly after each of these checks was received by Seaboard, it issued its check in an identical amount to the taxpayer who executed his promissory note to Seaboard for the amount thereof. The same practice continued in 1953 with seven pairs of checks. The taxpayer deducted[5] from his gross income in 1953 the amount of his seven checks, $71,011.82, along with an amount equal to the interest he theoretically was entitled to receive on the Treasury notes and which was credited to him by Seaboard.

On January 19, 1954 the taxpayer's assignee ordered Livingstone to sell the $10,000,000 Treasury notes and after paying off the taxpayer's promissory note to Seaboard, to remit the difference. Livingstone issued a confirmation slip indicating that $10,000,000 Treasury

4. Apparently the bank relied upon Livingstone for reimbursement of the $1,562.50 difference in the checks and for the bank's fee for handling the notes.

5. The amount of the deduction for interest payments finally set forth on the taxpayer's return for 1953 was decreased by $38,000 from this amount as a result of an exchange of checks on June 5, 1953 between Seaboard and the taxpayer which purported to represent a refund of interest.

1⅜% notes maturing on March 15, 1954 had been sold at 100³²⁄₃₂ plus interest for a total sum of $10,075,984.12. On Seaboard's books this amount was debited to Accounts Receivable, Livingstone & Company, and was credited to notes receivable, interest income and loans receivable and the taxpayer's note was cancelled.

■ The Tax Court from its examination of the entire record determined that all these transactions were pursuant to a preconceived plan which lacked substance and should be ignored for tax purposes, citing Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Griffiths v. Commissioner, 1939, 308 U.S. 355, 60 S. Ct. 277, 84 L.Ed. 319; Bazley v. Commissioner, 1947, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782, and that Seaboard was utilized merely for the purpose of recording the payment of interest which was never really paid.

The taxpayer contends that the finding of the Tax Court that the taxpayer's purchase of Treasury notes and borrowing from Seaboard were fictions without economic reality was clearly erroneous, and its disallowance of the interest deductions must be set aside.

■ However, a second ground for disallowing the interest payments was alternatively relied upon by the Tax Court which stated: "It may be further added that even if the transaction were considered as one of substance, the petitioner, being on the cash basis, would not, under the circumstances here disclosed, be entitled to a deduction for interest in either of the taxable years 1952 or 1953. There was no *payment* of interest. At best there would be no more than the giving of notes to evidence a liability for interest. It has been held many times that in the case of taxpayers on the cash method of accounting, the giving of notes to cover liability does not satisfy the statutory requirement of payment and does not permit a deduction from gross income." With this finding we are in accord. See Hart v. Commissioner of Internal Revenue, 1 Cir., 1932, 54 F.2d 848. Taxpayer cites Newton A. Burgess, 1947, 8 T.C. 47, which would seem to hold to the contrary but to us the reasoning of the dissenting members of the court is the more persuasive.

Moreover, we are convinced that following the transactions of October 27, 1952, there existed no indebtedness from the taxpayer to Seaboard. Despite the transitory possession by the Guaranty Trust Company of the Treasury notes for Livingstone's account who was acting as the taxpayer's agent, there was never in substance either a purchase of the notes by the taxpayer or borrowing of the purchase funds from Seaboard. However, it would seem that these transactions did create a legal relationship between the taxpayer and Seaboard,[6] but it was not one of borrower and lender. Rather the net result of these transactions was the exchange of promises of future performances between the taxpayer and Seaboard. The taxpayer promised to pay Seaboard a certain preascertained sum of money on March 15, 1954 or at any time before that date which he may select. Seaboard in return promised to acquire and deliver to the taxpayer on the date so selected $10,000,000 face value of 1⅜% United States Treasury notes maturing on March 15, 1954 with interest accrued from the date of the contract.

■ The Tax Court also denied to the taxpayer a deduction of $14,722.02 which was claimed as a loss incurred in 1952 as a result of a transaction entered into for profit under Section 23(e) (2) of the 1939 Code. This amount represented the net down payment made by the taxpayer to Livingstone. It is contended that if the purchase of Treasury notes in 1952 was not recognizable for income tax pur-

6. There does not appear to be any suggestion that the taxpayer had any means of controlling the management of Sea-

board, through ownership of stock. See Matthew M. Becker, P–H 1959 TC Mem. Dec. ¶59,019 (1959).

poses, and we have sustained the Tax Court in so deciding, then this payment which was made to procure the ownership of these notes was a complete loss. The Tax Court held that because the taxpayer did not intend to purchase and did not purchase any Treasury notes, there was no transaction entered into for profit within the meaning of Section 23 (e) (2). However, it cannot be denied that this amount was actually expended by the taxpayer in connection with a transaction which, although it did not result in the purchase of Treasury notes or the borrowing of money, did create a bilateral contract between himself and Seaboard. The transaction was not completed until this contract was either executed or terminated in some manner. This completion did not occur in 1952 and consequently its expenditure cannot be deducted as a loss for that year but rather must be classified as an item of cost to be considered in the taxable year when the transaction was finally completed. See Helvering v. Winmill, 1938, 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52.

The third point raised by the taxpayer concerns the effect of the two letters addressed to M. Eli Livingstone and Mrs. Louise F. Livingstone. The taxpayer contends that although these letters were not addressed to him they were shown to him by Livingstone and he relied upon their approval of transactions which would seem to be essentially undistinguishable from that presented here.[7] In fact the taxpayer stated, and there is no reason to disbelieve him, that he would not have entered into this transaction if he had not seen these letters. Under these circumstances, the good faith of the taxpayer in attempting to reduce his taxes by this method is unassailable. However, an essential fact here is that these letters were not intended to be applicable to the taxpayer. If such were the case and particularly if the ruling referred to a prospective transaction it is evident that there would be serious question as to whether the Commissioner had abused the discretion given him under Section 3791(b) of the 1939 Code.[8] It seems clear that any abuse of this discretion would be reversible by this court. See Automobile Club of Michigan v. Commissioner, 1957, 353 U.S. 180, 184, 77 S.Ct. 707, 1 L. Ed.2d 746. But to hold that the Commissioner is bound by rulings specifically addressed to a taxpayer other than the one whose return is questioned would severely limit the usefulness of the long established practice of private administrative rulings. The taxpayer strongly relies upon Lesavoy Foundation v. Commissioner of Internal Revenue, 3 Cir., 1956, 238 F.2d 589, but in that case the ruling, which was a certificate of exemption, was specifically applicable only to the taxpayer in question. The determination by the court in that case that the Commissioner abused his discretion in retroactively revoking the taxpayer's exemption is not relevant to the situation presented here. We are of the opinion that the Tax Court was correct in holding that insofar as the only published ruling dealing with this type of transaction, Rev.Rul. 54–94, 1954—1 Cum.Bull. 53, concluded that payments such as those made by the taxpayer were not deductible and that no individual ruling to the contrary was ever issued to the taxpayer, he cannot now assert that the Commissioner committed error in his retroactive application of the published ruling.

Judgment will be entered affirming the decision of the Tax Court.

7. The first letter did not indicate that the interest payments made by the taxpayer were financed by the Finance Company. This fact was disclosed in the second letter.

8. "The Secretary, or the Commissioner with the approval of the Secretary, may prescribe the extent, if any, to which any ruling, regulation, or Treasury Decision, relating to the internal revenue laws, shall be applied without retroactive effect." 26 U.S.C.A. § 3791(b).