Egbert J. MILES, Jr., Plaintiff, Appellant,

v.

M. Eli LIVINGSTONE, d/b/a Livingstone & Co., Defendant, Appellee.

No. 5853.

United States Court of Appeals
First Circuit.

March 27, 1962.

Daniel F. Featherston, Jr., Boston, Mass., with whom Choate, Hall & Stewart, Boston, Mass., was on the brief, for appellant.

Mack M. Roberts, Boston, Mass., with whom Melvin Newman, Brookline, Mass., and Roberts, Marshall & Weiss, Boston, Mass., were on the brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Massachusetts directing a verdict for the defendant in a civil action to recover prepaid interest on three loans arranged by the defendant, a dealer in government securities, the proceeds of which were to be used by the plaintiff to buy certain government securities from the defendant for the dual purpose of obtaining an advantageous deduction on his federal income tax return for the interest paid, and insuring that any profit realized on the transaction would be taxed at capital gain rates.

Plaintiff-appellant's complaint is in three counts: the first count alleging a scheme or artifice to defraud under federal securities regulations;[1] the second count alleging an action in common-law deceit and the third count alleging a breach of the three contracts. In his answer the defendant admitted that he contracted with the plaintiff on three occasions relative to arranging loans and selling bonds, but denied that the loans and sales did not in fact take place. As affirmative defenses he alleged the statute of limitations and knowledge on the part of the plaintiff of all facts and circumstances concerning the transactions.

The type of transaction which forms the basis of the present action has been a source of a great deal of litigation.[2] The facts underlying two of the three transactions involved here are virtually identical with those before us and recounted at length in Goodstein v. Com-

---

1. The first count charges violations of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq. and the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq.

2. See, e. g., Matthew M. Becker, ¶ 59,019 P H Memo T.C., aff'd 277 F.2d 146 (2 Cir. 1960); Eli D. Goodstein, 30 T.C. 1178 (1958), aff'd, 267 F.2d 127 (1 Cir. 1959); Leslie Julian, 31 T.C. 998 (1959), aff'd, 273 F.2d 867 (2 Cir. 1959).

missioner, 267 F.2d 127 (1 Cir. 1959).[3] We do not believe it essential to repeat them here in detail. In general, however, the record indicates that the transactions as envisioned by the parties were to unfold as follows: defendant would enter into a contract to sell certain government bonds to the plaintiff on a given date at a stipulated price. At or about the same time defendant would arrange a loan for the plaintiff with a finance company to finance the purchase price of the bonds. The finance company would forward the proceeds of the loan to the defendant in payment of the bonds. Plaintiff would execute a nonrecourse note for the loan in favor of the finance company and pledge the bonds as security. Defendant would send to the finance company the bonds which the plaintiff had purchased. The excess of the proceeds of the loan over the purchase price of the bonds would be forwarded to the the plaintiff. The plaintiff would then send a check to the finance company prepaying the total interest due on the loan. When plaintiff's note became due, the finance company would be instructed to sell the bonds and use the proceeds to pay the note. The finance company would do this and then render the plaintiff a final statement.

In the course of the three transactions plaintiff contracted to purchase $1,375,000 of United States Treasury notes and bonds. The only money which he paid out was an aggregate of some $18,000 in interest payments to the finance companies. All of the foregoing constituent stages in each transaction were duly reflected in elaborate bookkeeping entries and in the drawing of notes and checks. However, the transactions were essentially "paper" ones and the finance companies which were utilized to finance the transactions were in fact alter egos of the defendant.

Unlike the instant case, the type of transactions usually involved here have been analyzed in the context of a dispute involving the deductibility of interest payments under the federal income tax laws. In such a context, courts have unvaryingly held that the purported interest payments could not be deducted as their underlying events lacked substance. One court in noting the lack of economic reality to the transactions, stated: "[The] Decision here can be placed on the more fundamental ground that all the elaborate drawing of checks, execution of notes and bookkeeping entries performed by taxpayers, Livingstone and Gail, did not in fact produce the legal transactions which they simulated." Lynch v. Commissioner, 273 F.2d 867, 871 (2 Cir. 1959). Another court, in disallowing a similar attempted interest deduction, stated that "In reality, this financial round robin was only a paper transaction that did not involve any real Treasury notes or any real money. * * *" Broome v. United States, 170 F.Supp. 613, 614, 145 Ct.Cl. 298 (1959). This court reached the same conclusion in Goodstein v. Commissioner, supra.

After plaintiff's attempt to deduct the interest which he had prepaid on the "loans" was disallowed, he initiated the instant action. His central position is that until the attempted deductions were disallowed, he was unaware that these transactions lacked substance. Relying on the line of cases of which Goodstein, supra, is an example, he argues that neither a sale of the bonds nor a loan of money ever took place and that the paper shuffling of the defendant was a fraudulent device or artifice as to him.

Despite the arguments advanced in the brief of defendant's counsel, we believe that the district court was correct in directing a verdict for the defendant.

First of all, so far as the sale aspects of the transactions went, viz., the sale of bonds from Livingstone to Miles, this phase of the transactions was sufficiently viable that Miles could and did claim a capital gain on each of these transactions and duly recorded the gain on his

---

3. The third transaction differed only in the time interval which elapsed during certain steps of the transaction.

income tax returns. If the sales were valid to this extent it is extremely difficult for us to see how plaintiff can now claim that there was in fact no sale.

Secondly, concerning the loans, it is true that several courts, including our own, have held that facts similar to those involved here did not give rise to a "loan" in the sense that interest paid incident thereto could be deducted under the tax laws. However, none of those cases had been decided at the time that the present transactions were negotiated. The question of how these arrangements would pass judicial scrutiny was then an open one. It is true that subsequently, in keeping with the well settled principle that substance and not form governs the administration of the revenue laws, the transactions were held incapable of effectuating their desired result. However, because a court might later hold that a particular transaction did not achieve a desired tax result in that it lacked economic reality, it does not necessarily follow that such a transaction must be branded as a fraudulent device or artifice. Plaintiff makes such an argument here.

In this case plaintiff, a college graduate, was an extremely successful and obviously astute business man. He earned a salary that ranged between $50,000 and $75,000 a year during the period that these transactions were negotiated. His motives in entering the instant transactions were not to physically acquire bonds but, obviously, to generate a structure of documentation which would present advantageous tax benefits to him. To be sure, as he contends, he wanted the transactions to be *bona fide,* but it does not appear that the specific physical form in which the transactions were to be cast was of particular moment to him. This he admitted at the trial.

The record indicates that throughout the proceedings he was guided by a tax advisor who was also a lawyer to whom he granted complete authority to handle all the pertinent details—short of actually consummating the transactions. In addition he was advised by another counsel who apparently watched over the activities of the "tax advisor."[4]

Our reading of the entire record leads us to agree with the conclusion of the district judge that:

" * * * It is quite plain that the three transactions were spurious and without substance and that both the plaintiff and the defendant knew it.

"No reasonable person could accept as true the plaintiff's story that he really believed he could buy $1,-

---

4. Plaintiff was vigilant in all of these transactions particularly in connection with the execution of the nonrecourse notes to the finance companies. Thus his testimony at the trial indicated that after he had conferred at length with his "tax advisor" on the form of the note, he then went and further checked with another attorney.

"The Witness [plaintiff]: I did not outline the note.

"The Court: Was it done by your attorney * * *?

"The Witness: He submitted me a sample note which was essentially like that."

     *    *    *    *    *

"The Court: We are talking about prior to your entering into any of these three transactions. Prior to your signing, let's say signing, the documents that you did sign in connection with the first transaction, was Mr. Simons your tax advisor? You said he was, didn't you?

"The Witness: Yes.

"The Court: Now if he was your tax advisor, as you say, did he give you any advice?"

     *    *    *    *    *

"The Witness: Advice, and we talked over various things in regard to taxes. * * * I did talk to Mr. Simons probably four or five times before I entered into these transactions."

     *    *    *    *    *

"A. Yes, I had retained him [Simons] as my tax advisor."

     *    *    *    *    *

"A. I had another attorney look the note over before I signed it."

     *    *    *    *    *

"A. I took the other attorney's advice as to just what the note was.

     *    *    *    *    *

"XQ. You went to two attorneys to check on the note * * *?

"A. I don't remember which one I went to first."

375,000 in United States Treasury notes and bonds by paying out a little more than $18,000 without incurring further liability and at the same time acquire the right to claim on his income tax returns deductions for alleged interest payments totaling more than $77,000, resulting in a tax savings amounting to several times his original outlay of $18,-000."

Judgment will be entered affirming the judgment of the district court.