**Dean MARTIN et al., Plaintiffs,**

v.

**LIVINGSTONE SECURITIES CORPORATION**

and

**M. Eli Livingstone and Samuel Livingstone, d/b/a Livingstone & Company, Defendants.**

Civ. A. No. 60–354–C.

United States District Court
D. Massachusetts.

July 2, 1963.

See also 192 F.Supp. 862.

John R. Hally, Nutter, McClennen & Fish, Boston, Mass., for plaintiff.

Mack M. Roberts, Boston, Mass., Melvin Newman, Brookline, Mass., for defendants.

CAFFREY, District Judge.

This is an action of contract in which the plaintiffs sue the defendants for damages for breach of a contract to sell plaintiffs various amounts of a certain issue of United States Treasury 2½% bonds. Jurisdiction of this court is based upon diversity of citizenship. The plaintiffs are six individuals engaged in various aspects of the entertainment business; five reside in California, one in New York. The defendants are M. Eli Livingstone, d/b/a Livingstone & Company, a resident of Massachusetts, and Livingstone Securities Corporation, a Delaware corporation with a usual place of business in Boston, Massachusetts. The individual defendant is engaged in the business of investments, with particular reference to Government securities. The corporate defendant is a broker dealing in Government securities.

At all times material to this case the plaintiffs were represented in negotiations with the defendants by one Edward Traubner, d/b/a Edward Traubner & Company, Inc. Traubner is the "Business Manager" for plaintiffs and in this capacity is employed by plaintiffs to receive their income, pay their bills, render periodic accounts, and render financial and investment advice.

Plaintiffs in the year 1959 had incomes which placed them in the 65 to 80 per cent bracket for Federal income tax purposes. It was stipulated that if plaintiffs had appeared and testified each would have testified that he had no personal negotiation with either of the defendants, that Traubner represented him in all negotiations, that he knew of the nature of the proposed transaction in a general way, and that Traubner was fully authorized to act for him with respect to the transaction here in issue.

In their complaint plaintiffs allege that acting through the agency of Traubner they entered into separate contracts with the defendants by which the defendants agreed to sell, on or before December 31, 1959, to each plaintiff, varying amounts of United States Treasury 2½% bonds due to mature November 15, 1961. The total face amount contracted for by the six plaintiffs was $1,900,000. Plaintiffs agreed to buy at 95 20/32, i. e., $956.25 for each $1,000 bond.

The complaint recites that plaintiffs agreed to pay by check a sum representing approximately five per cent of the cost of the bonds, plus accrued interest and commissions. The defendants agreed to loan to plaintiffs the remaining 95 per cent of the cost of the bonds, i. e., $1,721,875, for the period December 31, 1959 to November 15, 1961, interest on this loan to be at the rate of 5% per annum. Plaintiffs agreed to prepay to defendants on or about December 31, 1959, the entire amount of the interest due on this loan. The specific agreements as to each plaintiff with respect to total face value of bonds purchased, cost of that quantity of the bonds at the agreed price of 95 20/32, cash down-payment on account of margin commission and accrued interest, loan from defendants, and prepaid interest, were as follows:

| | No. Bonds | Total Cost | Loan Livingstone Sec. Corp. | Paid by Collateral | Clients' Prepaid Interest |
|---|---|---|---|---|---|
| Cahn | 300,000 | 287,916.55 | 271,875.00 | 16,041.55 | 25,488.28 |
| Green | 300,000 | 287,916.55 | 271,875.00 | 16,041.55 | 25,488.28 |
| T. Martin | 500,000 | 479,860.92 | 453,125.00 | 26,735.92 | 42,480.47 |
| D. Martin | 500,000 | 479,860.92 | 453,125.00 | 26,735.92 | 42,480.47 |
| Webster | 200,000 | 191,944.37 | 181,250.00 | 10,694.37 | 9,500.00 |
| Englund | 100,000 | 95,972.18 | 90,625.00 | 5,347.18 | 5,000.00 |
| | 1,900,000 | 1,823,471.49 | 1,721,875.00 | 101,956.49 | 150,437.50 |

The complaint alleges that plaintiffs were advised by Traubner that the execution of these alleged contracts was financially advantageous to persons in their Federal income tax bracket since the transaction carried with it a tax deduction for prepaid interest in the calendar year 1959, together with an opportunity to treat any profit on the bonds held six months or longer as a long term capital gain in 1960 or some later year.

It is alleged that these tax considerations were made known to defendants and were a consideration in the negotiations. Plaintiffs allege that prior to the end of 1959, they remitted to defendants or their agents the required amount of margin and prepaid interest payments, and indicated their willingness to perform any other acts required by the alleged contracts, but that the defendants refused to buy the bonds and thereby breached the contract; that thereafter the bonds rapidly appreciated in price and at the time of filing the complaint the plaintiffs had lost an opportunity to realize a long term capital gain because of the breach of the alleged contract by defendants. Defendants concede that negotiations of the type alleged took place, but claim these negotiations were not carried to completion and that no binding contract was ever entered into between the parties. The defendants further say that the contract failed of fruition by reason of plaintiffs' wrongful failure to (1) sign promissory notes for the amount of the intended loans, and (2) make the 5% margin payments.

I find that because Traubner was familiar, at least in a general way, with adverse tax rulings in cases involving

similar transactions to the instant one [*] in which the defendant Livingstone had been involved, Traubner insisted that the instant transaction be executed through the use of financial entities independent of and legally distinct from either of the defendants or any of their affiliated business entities. M. Eli Livingstone agreed to the use of outside banks or brokers and initially selected Hirsch & Co. of New York as the brokerage to be used to execute this transaction.

I further find that because of Traubner's familiarity with tax litigation in which defendants had been involved, Traubner believed that when the Government "saw Livingstone's name associated with anything they would question it," and for this reason Traubner required that any transaction would have to be made through a bank; that there would be an *actual* purchase of bonds, an *actual* payment of margin and an *actual* prepayment of interest.

I further find that in 1957 Traubner participated in a transaction on behalf of five of the instant plaintiffs with M. Eli Livingstone. This transaction involved the purchase of Government obligations and corporate stocks and bonds, physical possession of which was to have been held by Livingstone until Traubner paid off a note. Prior to maturity of this note Livingstone "inadvertently" sold some of the stocks and thereafter it took between nine and twelve months for Traubner to obtain the return of those stocks from Livingstone. Because of this experience Traubner told Livingstone in the course of negotiating the present contract, "I was not interested in making it on the same basis we had before because I did not trust him. Livingstone said, 'We can work this out. I trust you. We could work it out so that you could hold everything and be my agent.' Traubner said, 'How can we do this, let me see the paper work * * *

I would like to see the form that this would fall on,' and Livingstone said 'I (Traubner) would be his agent, I would be in control as far as he was concerned' and that 'I would like the proposition.' " Livingstone agreed to carry out the proposed transaction in accordance with Traubner's requirements.

I further find that as an inducement to Traubner to enter into this contract M. Eli Livingstone offered to buy bonds of the series involved with the proceeds of the prepaid interest checks and send them to Traubner to hold so that if the transaction were performed Livingstone would own the interest earned by these bonds but if the transaction fell through then the bonds could be liquidated so as to enable Traubner to recover the interest prepayment. A second purpose of the delivery of $175,000 of these bonds was to have available a fund from which Traubner could obtain a partial refund of prepaid interest if plaintiffs elected to take a capital gain after six months but before maturity of the proposed note. I believe Traubner's testimony that M. Eli Livingstone said "that was satisfactory."

I find that an agreement as outlined above was reached between the parties and that pursuant thereto, on December 29, 1959, Traubner sent to Hirsch & Co. two separate sets of checks. One set of checks was in payment of the amount due from each of the six plaintiffs for prepaid interest. These six checks, totaling $166,437.50, were cashed by Hirsch & Co. and credited to Livingstone Securities Corporation's account with Hirsch. The second set of checks, representing the amount due from each plaintiff on account of margin, commission and accrued interest, was not cashed by Hirsch & Co. and was returned to Traubner by Hirsch on January 15, 1960, pursuant to instructions given to Hirsch & Co. by Samuel Livingstone, vice-president of Livingstone Securities Corporation. The

---

[*] E.g., Sonnabend v. Commissioner, 17 T.C.M. 882 (1958), aff'd. 267 F.2d 319 (1 Cir., 1959); Goodstein v. Commissioner, 30 T.C. 1178 (1958), aff'd. 267 F.2d 127 (1 Cir., 1959); Lynch v. Commissioner, 31 T.C. 990 (1959), aff'd. 273 F.2d 867 (2 Cir., 1959).

reason given for the return was that the cover letter forwarding these checks (Exhibit 8) was in improper form, since it directed that the bonds were to be in the names of the various plaintiffs. I find there is no merit in this position since Exhibit 8 specifically provided "These checks are all for Account No. 128185." · Livingstone's account with Hirsch & Co. was numbered 128185, on Hirsch's books of account. While Traubner might well have terminated the contract at this point because of the wrongful rejection of the six margin downpayment checks, he nevertheless continued to negotiate with Livingstone looking for a performance of this contract by Livingstone.

On January 1, 1960, Traubner sent a telegram to Hirsh & Co. advising that he had remitted $166,437.50 to Hirsch for the account of Livingstone Securities Corporation, and ordering Hirsch to forward $175,000, the face amount of the 2½% November 1961 Government bonds, to Traubner's account at the City National Bank, Beverly Hills, California. Hirsch & Co. complied with the directions in the telegram and Traubner received $175,000, the face amount of the bonds, about January 10, 1960.

I find that as early as January 5, 1960, Traubner, in a conversation with Livingstone, advised Livingstone that the paper work had not been completed, that he had not received the papers that had to do with the bank, and that he would like to sign everything at one time. At this time, Livingstone explained to Traubner that he was having difficulty completing the transaction "because of the interest rates going up a bit and he was working it out."

I find that in the second week in January, in a conversation with Livingstone, Traubner informed Livingstone that a set of documents submitted to him by Livingstone which contemplated effectuating the transaction through the use of the Provident Tradesman's Bank & Trust Company of Philadelphia, was still incomplete "in that there was supposed to be an authorization for me (Traubner) to the bank from Livingstone that I would be the only one empowered to act on these bonds." I find that Livingstone agreed that the papers were incomplete and that "he (Livingstone) would take care of it."

I find that shortly after January 15, 1960, Livingstone informed Traubner that "he (Livingstone) had been having trouble with the interest because it had gone up in the last few weeks, he did not want to go through with the deal because it was becoming too difficult." Traubner advised Livingstone that "I was going to insist that he go through with the deal, I performed as I should have," and Livingstone "agreed to go through with it again and make every effort to buy the bonds." I find that at this time Livingstone said that he was going to follow through with what had been discussed early in December and that Traubner would have complete authority in handling all the bonds at the bank.

I find that in the last week of January another conversation was had in which Traubner asked Livingstone for the proper authorization for Traubner to have the complete authority on the bonds at the bank so that Livingstone would not be able to hypothecate them again. At this time Livingstone against indicated that he was going to purchase the bonds and indicated that he would submit one note to be signed only by Traubner in lieu of six notes to be signed by the individual plaintiffs. I find that at this time (about January 26–27) Traubner advised Livingstone that he would not sign the papers until Livingstone bought and deposited the bonds in question. I find that on this date Traubner was aware that the market price of bonds had risen, that interest rates were up, and that Livingstone would have to absorb a loss to complete the transaction.

I further find that on February 16, Livingstone wrote a letter to Traubner in which he stated, "I am making arrangements to cover the bonds, I will notify you as soon as I have then firmed up." In a conversation in late February, Liv-

ingstone reiterated to Traubner that he was going to follow through and cover the bonds, and in early March Livingstone proposed that the deal be consummated through a New York firm, Garvin Bantel & Company. Pursuant to this proposal, on March 15, Traubner remitted his check for $101,596.49 to Garvin Bantel to cover the margin purchase on the $1,900,000 worth of bonds.

I find that just prior to March 15 Livingstone had asked Traubner to give him other business to make up the losses which Livingstone would sustain if he covered the instant bonds, and I find that Traubner insisted on Livingstone's performance of the instant contract before he would commit himself on giving any additional business. A few days after Traubner sent his check for $101,-596.49 to Garvin Bantel, he had a conversation with Livingstone in which Livingstone asked Traubner to use some of the money obtainable from the $175,-000 bonds in Traubner's possession to make up the difference between the $101,-596 and the loss that Livingstone was going to sustain on the purchase of the bonds at that time. Traubner refused to do so and testified that because of his refusal of this request Livingstone said he would "not go through with the deal" and "the meeting fell apart at that time."

I find and rule that this contract was wrongfully breached by M. Eli Livingstone during this conversation with Traubner which took place shortly after March 15, 1960.

To the extent that M. Eli Livingstone or Samuel Livingstone has testified to the contrary of any of the above findings, I disbelieve and reject their testimony.

On the issue of damages I find that on June 30, 1960, Traubner telegraphically ordered Livingstone to sell at market price $1,900,000 worth of the November 1961 Government 2½% bonds for the account of his clients. On July 1, 1960, the market price was 98 26/32 and $1,-900,000 face amount of the bonds if sold July 1, 1960 would have produced $1,877.-428. To determine plaintiffs' damages the cost of the bonds to plaintiffs as of

December 31, 1959, or $1,816,875 plus $593.75 for commission expense, or a total of $1,817,468.75, must be subtracted from the sale price. The difference, $59,959.25, is the capital gain to plaintiffs that would have been obtained had the contract been performed. To this plaintiffs are entitled to add six months interest (December 31, 1959 to July 1, 1960) on $1,900,000, at 2½%, or $23,-750, which when added to the capital gain gives a gross lost profit of $83,709.-25.

From this figure must be deducted the interest expense that plaintiffs would have incurred if they had paid 5% interest on a loan of $1,721,875 for six months, or $43,046. This computation produces a net lost profit to plaintiffs of $40,663.25, to which I find plaintiffs are entitled. Judgment for plaintiffs in the amount of $40,663.25 with interest and costs, on the amended complaint.

The counterclaim is dismissed. Judgment for the plaintiffs on defendants' counterclaim.