Adie v. SSA                          CV-95-217-SD  08/12/96 P

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Scott L. Adie


    v.                                      Civil No. 95-217-SD

Commissioner, Social
  Security Administration


O R D E R


    Pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), plaintiff Scott L. Adie seeks review of a final decision of the Commissioner of the Social Security Administration denying his claim for benefits.  Presently before the court is plaintiff's motion to reverse, which primarily argues that the decision of the Commissioner was not supported by substantial evidence.  Defendant has moved for affirmance.


Administrative Proceedings

    Plaintiff filed an application for a period of disability and for disability insurance benefits on November 23, 1993, alleging an inability to work since October 22, 1992.  Transcript (Tr.) 60-63.  The application was denied initially, Tr. 76-77, and upon reconsideration, Tr. 82-83, by the Social Security

Administration.  An Administrative Law Judge (ALJ), before whom plaintiff and his attorney appeared, considered the matter de novo, and on December 16, 1994, found that plaintiff was not under a disability.  Tr. 12-22.

Applying the five-step sequential evaluation process prescribed by 20 C.F.R. § 404.1520, the ALJ found that (1) Adie has not engaged in substantial gainful activity since October 22, 1992; (2) he has "severe degenerative disc disease", Tr. 21; (3) his impairments or combination of impairments do not meet or equal the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) his impairments prevent him from performing his past relevant work as a chef; and (5) he has a residual functional capacity (RFC) for sedentary work.  Tr. 21-22.  The ALJ further found that Adie was not credible regarding the severity of his subjective complaints of pain and their effect on his ability to perform substantial gainful activity.  Tr. 21.

The Appeals Council denied plaintiff's request for review on February 28, 1995, Tr. 3-4, thereby rendering the ALJ's decision the final decision of the Commissioner of the Social Security Administration, subject to judicial review.

Factual Background

Plaintiff Scott Adie had worked for nearly twenty years as a

chef when he injured his back while moving a refrigerated salad table at his place of employment on October 22, 1992. Tr. 39, 113. At the time of the accident, he was head chef at Capucino's Restaurant in Newton, Massachusetts, and was thirty-eight years old. Tr. 38, 158. Adie was out of work for approximately six weeks before he returned on a part-time basis with limited duties. Shortly thereafter he left work because of a returning pain in his back, buttocks, and right leg. Tr. 38, 41, 159.

On March 5, 1993, plaintiff was examined by Dr. B. Eugene Brady, an orthopedic surgeon, who reported that an MRI of plaintiff's lower spine revealed a herniation of the L5-S1 intravertebral disc. Tr. 113.[1] Otherwise, Dr. Brady found that plaintiff had normal ankle and knee reflexes and a normal motor exam, although a sensory exam showed some reduction of motion in his back. Dr. Brady recommended conservative treatment, including rest and a swimming program, and indicated that if plaintiff's symptoms did not improve, surgical intervention might

---

[1]It appears that plaintiff received medical attention on February 17, 1993, concerning his complaints of back pain, Tr. 112, but the details of this visit are unclear in the record and plaintiff does not describe them in his motion. Defendant, however, states that at such visit plaintiff was able to straighten and raise his right leg 75 degrees and had normal reflexes. See Defendant's Motion at 4. In addition, on such visit, plaintiff was diagnosed with back pain and was prescribed the medications Toradol and Flexeril. It was also recommended that he have an MRI of his spine and that he use a TENS unit. Id.

3

possibly be necessary.  Id.  Plaintiff continued to see Dr. Brady in April and May of 1993, complaining of back pain.  On May 14, 1993, Dr. Brady reported that from a standing position Adie continued to have flattening of the lumbar lordosis, consistent with persistent muscle spasm.  Tr. 114.

On April 9, 1993, Adie was evaluated by Dr. Mordecai E. Berkowitz, an orthopedic surgeon, at the request of the carrier of his employer's workmen's compensation insurance.  Adie complained to Dr. Berkowitz of lower back and right leg pain. Tr. 118.  Dr. Berkowitz observed plaintiff to be in mild distress, with limited range of motion in his back, and noted that at that time plaintiff did not appear to be capable of gainful employment.  Tr. 118-20.  In addition, he found plaintiff to have normal ankle and knee reflexes and normal strength.  Tr. 118-19.  Dr. Berkowitz diagnosed Adie as having a sprain to the lumbosacral spine with right sciatica and a questionable herniated disc at L5-S1.  Tr. 119.  He further opined that the objective findings substantiated plaintiff's subjective complaints, although the limitations in his back motions were somewhat greater than that which would normally be expected of a patient who had received the type and degree of therapy that plaintiff had previously received (traction, hydroculator pads, ultrasound, and massages).  Tr. 119-20.  Dr. Berkowitz

4

recommended that claimant undergo a more aggressive rehabilitative exercise program, and further noted that claimant might need surgery should a new MRI confirm the presence of a herniated disc at L5-S1.  Tr. 121.

Dr. Scott Masterson treated plaintiff on June 8, 1993, at the Northeast Rehabilitation Hospital.  Tr. 150-52.  Dr. Masterson noted that Adie had L5-S1 disc herniation, centrally located.  Tr. 151.  Physical examination revealed minimal lumbar range of motion and no lumbar lordosis.  Tr. 151.  He also reported that Adie's clinical examination was more significant for localized muscular tenderness, loss of lumbar symmetry, and deconditioning than specifically for a lumbosacral radiculopathy. Id.  He recommended that Adie go on a six-day course of anti-inflammatory medication, physical therapy, and a swim therapy program.  Tr. 152.  At a follow-up examination three weeks later, Dr. Masterson observed that Adie was still walking with a forward flexed position and a slight limp in the right leg.  Tr. 153. Adie was also still tender around the right iliolumbar region, the right PSIS, and somewhat in the sacroiliac region, although not in the gluteals or the greater trochanter.  Id.  On this visit, Adie told Dr. Masterson that he would not take the six-day course of steroids because he feared the long-term side effects. Id.  However, he agreed to a local steroid injection into the

5

area of the iliolumbar region and the PSIS. Id. Dr. Masterson recommended a regular swimming program and continuation of Adie's exercise program, but discontinued physical therapy for Adie's back. Id. A mid-August progress report to Dr. Masterson written by Adie's physical therapist indicated that the swimming therapy had not helped Adie's symptoms. Tr. 124.

On August 16, 1993, Adie reported to Dr. Masterson that he was feeling worse and that he still was experiencing pain in his lower back, radiating down into his legs. Tr. 154. At Adie's request, Dr. Masterson referred him to a neurosurgeon for further work-up and a decision about surgical intervention. Id.

On August 31, 1993, Adie was examined by Dr. Amin F. Sabra, a neurologist, Tr. 128-29. On this visit, plaintiff reported pain upon standing or sitting, relieved by lying down on one side. Tr. 128. Dr. Sabra noted plaintiff was able to straight-leg raise to 45 degrees bilaterally and that his reflexes were normal, but that there was diffuse weakness in the left leg. Id. In addition to a CAT scan and an EMG, Dr. Sabra recommended conservative treatment. Tr. 129. A CAT scan of plaintiff's lumbosacral spine, performed on September 10, 1993, revealed mild stenosis at L5-S1, with disc protrusion centrally and toward the right, which appeared to impinge on the right S1 nerve root and, to a lesser degree, on the left S1 nerve root, proximal to their

6

lateral recesses.  Tr. 132.  In addition, EMG and NCV tests revealed bilateral S1 radiculopathy, but no active denervation. Tr. 135.  At a follow-up examination, Dr. Sabra recommended aggressive physical therapy and an epidural block.  Tr. 130.  Dr. Sabra also noted the possibility of surgical intervention if plaintiff did not improve within six weeks.  Id.

On November 10, 1993, Adie was examined by Dr. Steven C. Schachter, a neurologist.  After noting that plaintiff's EMG had been abnormal and that a CAT scan had revealed a herniated L5-S1 disc, both to the right and to the left, Dr. Schachter diagnosed plaintiff as having a "[c]hronic herniated disc secondary to [his] work related injury."  Tr. 136.  After observing that conventional treatment had not helped plaintiff, he further opined that plaintiff would be "completely disabled from all forms of gainful employment including light and sedentary activity given the degree of pain that he is in and his functional limitations" until he received surgery.  Tr. 136-37.

Plaintiff visited Dr. Edwin G. Fischer, a neurosurgeon, in February 1994.  Tr. 155.  Dr. Fischer found plaintiff had limited range of motion of his back, but that he had normal reflexes and essentially normal strength in his lower extremities.  In addition, no sensory loss was apparent.  In March, after examining claimant's test results, Dr. Fischer concluded that

7

surgery would not be unreasonable given the duration of plaintiff's disability. Tr. 156. Dr. Fischer also prescribed Flexeril and Darvocet.

Dr. Deepak S. Tandon, a neurologist, examined plaintiff on April 29, 1994, at the request of plaintiff's employer's workmen's compensation carrier. Tr. 158-65. Plaintiff told Dr. Tandon he was experiencing moderately severe lower back pain, with right-sided sciatica, and that the pain frequently traveled down the right buttock to the back of the right knee. Tr. 161, 164. Upon examination, Dr. Tandon found mild restriction of lumbar spine movements, difficulties with straight-leg raising, a moderate amount of lumbar muscle spasm, and an antalgic gait. Tr. 164. Dr. Tandon further found no evidence of a motor or sensory deficit. Id. He opined that the objective findings did correlate with the subjective symptoms, Tr. 164-65, and also noted that he thought surgery would be beneficial to plaintiff, Tr. 164.

On August 23, 1994, Adie visited Dr. Schachter and told him that although Dr. Fischer had recommended surgery, he had refused because of fears of surgical complications. Tr. 141. Adie also complained of pain as before, varying from dull and constant to sharp and severe. Id. Dr. Schachter discussed the advisability of surgery with Adie, prescribed Flexeril and Percocet, and

8

recommended that Adie continue with his TENS unit and swimming program.  Id.

In September 1994, Dr. Schachter completed a medical assessment of plaintiff's ability to perform work-related activities.  Tr. 142-48.  Dr. Schachter opined that for an eight-hour day, plaintiff would be able to lift and/or carry up to 15 pounds occasionally and up to 10 pounds frequently.  Tr. 142.  He also stated that plaintiff could stand and/or walk for 30 minutes at a time, for a total of three hours per day, and that plaintiff's ability to sit was not affected by the impairment.  Tr. 143.  Furthermore, although plaintiff could occasionally climb and balance, he could not stoop, crouch, kneel, crawl, push, or pull.  Tr. 144.

## Discussion

### A.  Standard of Review

Pursuant to the Social Security Act, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary [of Health and Human Services], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g) (Supp. 1994).

A denial of social security disability benefits should be upheld unless "'the Secretary has committed a legal or factual

9

error in evaluating a particular claim.'" Manso-Pizarro v. Secretary, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

When reviewing a social security disability determination, the factual findings of the Secretary "shall be conclusive if supported by 'substantial evidence.'" Irlanda Ortiz v. Secretary, 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)). "[S]ubstantial evidence" requires "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Rodriguez v. Secretary, 647 F.2d 218, 222 (1st Cir. 1981).

However, substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citing NLRB v. Nevada Consol. Copper Corp., 316 U.S. 105, 106 (1942)). Moreover, the decision of the Secretary must be affirmed, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Secretary, 819 F.2d 1,

10

3 (1st Cir. 1987) (citing <u>Lizotte v. Secretary</u>, 654 F.2d 127, 128 (1st Cir. 1981)), <u>cert. denied</u>, 484 U.S. 1012 (1988).

It is incumbent on the Secretary "to determine issues of credibility and to draw inferences from the record evidence." <u>Irlanda Ortiz</u>, <u>supra</u>, 955 F.2d at 769 (citing <u>Rodriguez</u>, <u>supra</u>, 647 F.2d at 222). Moreover, "the resolution of conflicts in the evidence is for the Secretary, not the courts." <u>Id.</u>; <u>Evangelista v. Secretary</u>, 826 F.2d 136, 141 (1st Cir. 1987); <u>see also</u> <u>Burgos Lopez v. Secretary</u>, 747 F.2d 37, 40 (1st Cir. 1984); <u>Sitar v. Schweiker</u>, 671 F.2d 19, 22 (1st Cir. 1982).

Since determinations regarding factual issues and the credibility of witnesses are entrusted to the Secretary, whose findings should be accorded great deference, <u>see</u>, <u>e.g.</u>, <u>Frustaglia v. Secretary</u>, 829 F.2d 192, 195 (1st Cir. 1987), the court "'must uphold the Secretary's findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" <u>Irlanda Ortiz</u>, <u>supra</u>, 955 F.2d at 769 (quoting <u>Rodriguez</u>, <u>supra</u>, 647 F.2d at 222).

<u>B. Step 5</u>

Adie challenges the adverse decision below on the ground that the ALJ erroneously concluded, at step five of the

sequential evaluation process, that plaintiff's back pain would not preclude him from performing sedentary work.  At step five the burden shifts to the Commissioner to demonstrate the existence  of jobs in the national economy that claimant can perform.  Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991) (citing Ortiz v. Secretary, 890 F.2d 520, 524 (1st Cir. 1989)).

In evaluating subjective complaints of pain (and their effect on a claimant's ability to perform work), the ALJ first must decide whether there is "'a clinically determinable medical impairment that can reasonably be expected to produce the pain alleged.'"  Da Rosa v. Secretary, 803 F.2d 24, 25 (1st Cir. 1986) (quoting Avery v. Secretary, 797 F.2d 19, 21 (1st Cir. 1986)). "'[O]ther evidence including statements of the claimant or his doctor, consistent with medical findings, shall be part of the calculus.'"  Id. (citing Avery, supra, 797 F.2d at 25; 42 U.S.C. § 423(d)(5)(A)).  Should the ALJ decide to disbelieve the claimant, he must make "specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]."  Id. at 26 (citing Benko v. Schweiker, 551 F. Supp. 698, 704 (D.N.H. 1982)).

## 1.  The Objective Medical Evidence

Although finding Adie suffered from a "severe impairment"

causing pain, the ALJ did not believe Adie's complaints of pain were fully credible as to the severity of the pain or its effect on his ability to perform substantial gainful activity. Tr. 21. The ALJ based his conclusion, in part, on the objective findings of record. Tr. 20.

Claimant testified that his injury causes him to have muscle spasms and to experience a burning pain radiating down both legs. Tr. 41. He stated that he is able to sit 15 to 30 minutes before the pain reappears. Tr. 42. During a typical eight hour work day, he states he must lie down for three to four hours to relieve his pain. Tr. 47.

The ALJ's consideration of the objective medical evidence, and his determination of whether there was a clinically determinable medical impairment that could reasonably be expected to produce the pain alleged by Adie, can charitably be described as vague and incomplete. As an initial matter, it should be noted that the ALJ concludes that the claimant has "severe degenerative disc disease," Tr. 21, while in reality there is no evidence on the record of such disease. Instead, the medical evidence (including a CAT scan, an MRI, and an EMG), rather consistently indicates that Adie has a central herniated disc at

13

the location of L5-S1.[2]  Tr. 113, 135, 136, 151, 156.  There is also some evidence on the record of either bilateral radiculopathy (disease of the nerve roots), Tr. 135, or of denervation, Tr. 156.

In addition, the ALJ failed to adequately consider the medical evidence that could potentially corroborate plaintiff's claims.  When evaluating such allegations, the ALJ should consider the medical evidence on the record, such as any evidence of reduced joint motion, muscle spasm, sensory deficit, or motor disruption.  See 20 C.F.R. § 404.1529(2).  The ALJ, however, failed to do so.  For example, the ALJ does not mention that two physicians, upon examination, discovered moderate or persistent muscle spasms in claimant's lower back.  Tr. 114, 164.

Moreover, the ALJ mischaracterizes the medical opinions relating to whether plaintiff's subjective complaints are corroborated by objective findings.  For example, Dr. Tandon opined,

> Adie currently complains of moderately severe low back pain radiating down the right leg, in the sciatic distribution, to the back of the right knee.  Objective findings include mild restriction of lumbar spine movements, difficulties with straight leg raising tests, a moderate amount of lumbar muscle spasm and an antalgic gait.  There is no motor or sensory deficit at this time.  In

_____

[2]If the ALJ's mistake here was inadvertent, he (or another ALJ) will have the opportunity to clarify it on remand.

14

> my opinion, the objective findings do correlate
> with the subjective symptoms.

Tr. 164 (emphasis added). However, the ALJ concludes that Dr. Tandon opined that the objective findings did not correlate with the subjective symptoms.[3] Tr. 19.

The ALJ also appears to have only selectively considered the opinion of one of plaintiff's treating physicians, Dr. Schachter. A report written by Dr. Schachter on November 10, 1993,[4] states,

> Until such time that he undergoes surgery, [Adie] is completely disabled from all forms of gainful employment including light and sedentary activity given the degree of pain that he is in and his functional limitations.

Tr. 136-37 (emphasis added). The ALJ instead relies on a residual functional capacity assessment form that Schachter filled out in September of 1994 in which he checked a box

---

[3]The court pauses here to commend the integrity and skill of defendant's attorney. The court discovered the discrepancy between Dr. Tandon's opinion and the ALJ's rendering thereof from its own review of the record, as plaintiff did not call the matter to the court's attention. The defendant, nonetheless, accurately reports that Dr. Tandon opined that plaintiff's subjective complaints were correlated to his objective findings. See Defendant's Memorandum at 8. Such honesty and attention to detail, although perhaps not availing in the instant circumstance, likely has, and will in the future, serve defendant's counsel well.

[4]Plaintiff claims that said report was actually written on September 27, 1994, and that it was submitted into evidence at the hearing before the ALJ; however, there is no evidence of such report in the record provided to the court. The court therefore has assumed that plaintiff is referring to the report dated November 10, 1993.

15

indicating that Adie's ability to sit during the day was not affected by his impairment and which otherwise indicated that plaintiff was capable of performing activities consistent with sedentary work.[5]  Tr. 142-48.  As there is little written commentary in the assessment, there is no express statement about the degree of pain experienced by plaintiff.  There is also no mention in the assessment of why Dr. Schachter apparently departed from his previous opinion that the plaintiff experienced pain so severe as to prevent him from performing sedentary work.  The ALJ relies on the work assessment without mentioning Dr. Schachter's earlier reports or attempting to reconcile their conclusions.  Given that the Commissioner has the burden of production at step five, the ALJ's failure to explain why he gave more weight to Dr. Schachter's report of September 1994--or to elicit additional evidence that could shed light on Dr. Schachter's opinion--constitutes error.

In addition, the ALJ misconstrues the opinions of other physicians concerning whether the objective medical evidence substantiates claimant's subjective complaints of pain.  The ALJ states that other treating physicians (in addition to Dr.

_____

[5]Sedentary jobs generally require that the worker be able to remain seated most of the day.  See Da Rosa, supra, 803 F.2d at 26 (citing Thomas v. Secretary, 659 F.2d 8, 10-11 (1st Cir. 1981)).

Schachter) opined that claimant is qualified for work in the sedentary range. The court's review of the record reveals no such statements from a treating or a nontreating physician. Indeed, even the physicians who examined Adie on behalf of his employer's workmen's compensation carrier opined that Adie would not be capable of sedentary or light work until his condition improved.[6]

Given the ALJ's misrepresentation of the medical evidence that could potentially substantiate plaintiff's allegations of totally disabling pain, the ALJ has failed to provide the requisite specific findings to support his decision to discount Adie's reports of pain. It is thus incumbent upon the Commissioner to re-evaluate whether the objective medical evidence substantiates Adie's claims of pain.


## 2. The Avery Factors

If after evaluating the objective findings the ALJ determines that the claimant's reports of pain are significantly

---

[6]Dr. Tandon opined, "I do not believe that [Adie] is capable of sedentary or light work at this time, as there is enough evidence on the objective testing data (with EMG, MRI and CAT scan)." Tr. 165. Dr. Berkowitz opined, "At this time, this patient does not appear to be capable of gainful employment, but I believe that after two to three weeks of a rehabilitative exercise program, such as a swim program, he may be capable of a modified duty work capacity." Tr. 120.

17

greater than that which can be reasonably anticipated from the objective evidence, the ALJ must consider other relevant information. Avery, supra, 797 F.2d at 23. Considerations capable of substantiating subjective complaints of pain include evidence of (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medication taken to alleviate the pain or other symptoms; (5) treatment, other than medications, received to relieve pain or other symptoms; and (6) any other factors relating to claimant's functional limitations and restrictions due to pain. 20 C.F.R. § 404.1529(c)(3); Avery, supra, 797 F.2d at 23. The court will refer to these considerations collectively as "the Avery factors."

Although the ALJ considers some of the Avery factors in his decision to not fully credit plaintiff's reports of pain, he does not provide the "full description" required. See Avery, supra, 797 F.2d at 23. For example, the ALJ relies on the fact that claimant testified that he uses the medications Flexeril and Percocet for pain but had, at a much earlier point in time, told one of his doctors that he was not taking either medication. The ALJ apparently believed this discrepancy was significant because (1) claimant had not alleged any side effects from the

18

medications that would justify his decision to not take the medication at certain times, and (2) the low level of medication shows that plaintiff's pain is not so severe.  In fact, the claimant testified that he takes 10 milligrams of Percocet a day, but experiences dizziness and grogginess from it, and that he takes 10 milligrams of Flexeril three times a day, but said, "it's a muscle relaxer, so, you know, you don't want to do too much," Tr. 48.[7]  In addition, Adie testified that he takes 100 milligrams of Propacet[8] three or four times a day for pain, but the ALJ does not mention this testimony and thus apparently did not include it in his determination.  Tr. 48.

The ALJ also states that Adie testified that his pain is relieved by the pool therapy program he participates in three times a week.  Adie's actual testimony, however, was that such relief lasts sometimes for a couple of hours, but that sometimes the therapy even aggravates his condition.  Tr. 44.

The ALJ examined the claimant's daily activities, but,

---

[7]The court recognizes that the ALJ is entitled to disregard this testimony if not corroborated by medical records.  However, it is preferable that if the ALJ chooses to discount the testimony for such reason, he should so state, instead of mischaracterizing plaintiff's claim.

[8]Plaintiff appears to be referring to Darvocet, which is indicated for the relief of mild to moderate pain, see PHYSICIANS' DESK REFERENCE 1433, 1434 (50th ed. 1996), and has been prescribed for him on previous occasions, Tr. 156.

again, there are discrepancies between the ALJ's conclusions and the record. For example, the ALJ notes that Adie is able to cook, clean, and care for his three-year-old son. However, Adie testified that his wife does most of the household chores. Tr. 46. He also stated that although he is a former professional chef, he is now only able to make himself simple lunches. Tr. 46. He states in his Disability Report that he cares for his son by reading to him, teaching him, and changing his diapers, but that he can no longer play with him. Tr. 98, 99. There was further testimony that his son is in day care during the day until Adie's wife comes home. Tr. 50.

These and other inconsistencies within the ALJ's treatment of the Avery factors leads this court to conclude that the ALJ committed legal error by failing to provide a full and complete description of the factors (in addition to the medical evidence) capable of substantiating or disproving the claimant's reports of pain. Thus, on remand, not only must the Commissioner reconsider the objective medical evidence, but a new consideration of the Avery factors should be conducted as well.

### 3. Use of the Grid

Finally, although the record is not clear on this point, it appears that the ALJ committed legal error by relying solely on

the Medical-Vocational Guidelines set forth in 20 C.F.R. pt. 404, subpt. P, app. 2 (the Grid). Use of the Grid is appropriate where the claimant has an impairment that limits his ability to meet the strength requirements of certain jobs. Ortiz, supra, 890 F.2d at 524; 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e). However, "[w]here a claimant has nonexertional impairments in addition to exertional limits, the Grid may not accurately reflect the availability of jobs such a claimant could perform." Heggarty, supra, 947 F.2d at 996. In these situations, the Commissioner may rely on the Grid only where claimant's nonexertional impairment does not "significantly affect" his ability to perform the full range of jobs at the relevant strength level. Id. If the nonexertional impairment is of such character, the Commissioner usually must consider the testimony of a vocational expert. Id.

The ALJ determined that plaintiff's capacity for sedentary work was not compromised by his exertional limitations. Tr. 22. Applying the Grid rules as they relate to sedentary work, the ALJ determined that the claimant was not disabled. Such use of the Grid would be appropriate, except that the ALJ also found the claimant's residual functional capacity "for the full range of sedentary work is reduced by his pain." Tr. 21. The ALJ did not

qualify the extent to which Adie's ability to perform sedentary work is reduced.

If, on remand, the ALJ determines that the claimant's residual functional capacity for the full range of sedentary work is significantly reduced by his pain, the ALJ may not rely solely on the Grid. See Scott v. Shalala, 30 F.3d 33, 35 (5th Cir. 1994) (pain may constitute a nonexertional factor limiting the range of jobs a claimant can perform and therefore an ALJ should rely on expert vocational testimony, not the Grid, to show the existence of jobs); cf. Da Rosa, supra, 803 F.2d at 26 (pain "may be a nonexertional factor to be considered in combination with exertional limitations"). Instead, to fulfill the Commissioner's burden of showing the existence of jobs in the national economy that Adie is capable of performing, the ALJ must consider the testimony of a vocational expert.[9]

---

[9]A further point deserves mention. It appears from the record that the ALJ contemplated that the claimant could perform security guard work involving TV monitoring, which would permit him to stand up whenever he needed to relieve his pain. Tr. 54. If such consideration influenced the ALJ's conclusion that Adie could perform jobs in the national economy, again, the ALJ erred by not consulting a vocational expert. See Scott, supra, 30 F.3d at 35 (holding that it was improper to apply the Grid where claimant needed to alternate between sitting and standing).

<u>Conclusion</u>

For the reasons stated above, the court denies plaintiff's motion to reverse the final decision of the Commissioner (document 6) and denies defendant's motion to affirm (document 7). The case is remanded back to the Commissioner for proceedings not inconsistent with this opinion.

If the court had the power, it also would order that the case be transferred to a different administrative law judge. <u>See</u> <u>Sarchet v. Chater</u>, 78 F.3d 305, 309 (7th Cir. 1996) (discussing when district court may order transfer to new ALJ). In lieu of such order, the court will venture to merely suggest or recommend that a new ALJ be assigned.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

August 12, 1996

cc:  Steven I. Bergel, Esq.
     David L. Broderick, Esq.

23